[No. 29565. Department One. July 21, 1945.]

THE STATE OF WASHINGTON, *Respondent,* v. H. L. McWHINNEY, *Appellant.*[1]

[1]Reported in 161 P. (2d) 162.

*Robert O. Beresford* and *Wayne C. Booth,* for appellant.

*Lloyd Shorett* and *John J. Kennett,* for respondent.

MILLARD, J.—Predicated upon the statute (Laws of 1915, chapter 165, p. 493, Rem. Rev. Stat., § 2601 [P.P.C. § 117-47]), which provides that

"Every person who, with intent to deprive or defraud the owner thereof . . .

"(3) Having any property in his possession, custody or control, as bailee, . . . servant, . . . agent, . . . employee, . . . shall secrete, withhold or appropriate the same to his own use . . . shall be guilty of larceny,"

an information, reading as follows, charging defendant with the crime of grand larceny was filed in the superior court for King county:

"He, the said H. L. McWhinney, in the County of King, State of Washington, on or about the 16th day of June 1944, then and there having in his possession as agent, bailee, employee and servant, certain personal property, to-wit: $5,900.00 in lawful money of the United States, the property of Tradewell Stores, Inc., a corporation, then and there wilfully, unlawfully and feloniously did secrete, withhold and appropriate the same to his own use, with intent to deprive and defraud the said Tradewell Stores, Inc., a corporation, the said owner thereof; . . ."

Trial of defendant resulted in verdict of guilty as charged. From judgment sentencing him to confinement in the state penitentiary for maximum term of fifteen years, defendant appealed.

The first question presented is whether the evidence was sufficient to sustain the verdict. While the evidence, which is summarized as follows, is for the most part circumstantial, it amply sustains the verdict:

Prior to the evening of June 16, 1944, the date of the disappearance of the money which he was charged with embezzling, appellant was employed as manager of Tradewell Store No. 16 in West Seattle. The front door to the

store is twelve feet wide and consists of several sections which fold like an accordion when the door is fully opened. This front door was customarily locked by a key and a padlock. Iron rods were attached in a vertical manner to the lower part of several of the sections forming the door. The rear door to the store was locked from the inside. There was an opening through the roof of the store which could be reached by a ladder from the storeroom. This opening was covered like a hatch.

The theft occurred June 16, 1944, after closing hours. On the morning after the theft, two Seattle police detectives were present when the store was opened. They testified they carefully examined the rear door and the roof opening and found both locked from the inside and that there was no evidence of any tampering with either. Appellant testified that, prior to leaving the store on the day of the theft, he locked the back door with an iron bar and a padlock. He left the store June 16, 1944, about 6:30 p. m., leaving one Lorraine Bolt in charge.

It was a custom of the store to cash payroll checks of its customers, and appellant as manager of the store had authority to borrow five thousand dollars from the bank on pay days for that purpose. Appellant obtained, in the afternoon, on the day in question five thousand dollars just prior to the closing time of the bank, with which to cash payroll checks.

The four cash registers in the store were adjacent to aisles through which customers had to pass on their way out of the store. An employee, called a checker, stood back of the counter adjacent to these aisles, checked the merchandise selected by the customer, and received payment therefor. On June 16, 1944, only three of the cash registers were in operation. After obtaining the five thousand dollars from the bank, appellant distributed a portion of it among the three cash registers, and just prior to leaving the store at 6:30 he gave to Lorraine Bolt approximately two thousand dollars to place in the cash registers, which was the amount remaining of the five thousand dollars borrowed from the bank during the afternoon. The store was

customarily closed by the girl in charge at 9:00 p. m. Appellant usually left the store between 6:00 and 6:30 p. m.

There was a large iron safe in the store, the door of which was supposed to be left unlocked by appellant when he departed from the store. Appellant was the only person in the store who had the combination of that safe after he became manager of the store. It was the duty of the checker in charge at closing time to take all the money from the cash registers, place it in containers, and put those containers in the safe and lock the safe.

June 16, 1944, at 9:00 p. m., after the store was closed, Lorraine Bolt put all the money in the containers, went to the safe, and discovered that the door of the safe was closed and locked. She also discovered that the padlock for the front door was missing.

She and other fellow employees made a diligent search for the padlock, which was customarily kept in a drawer beneath cash register No. 2, but it could not be found. She thereupon called the appellant by telephone, informed him that the safe was locked and that the padlock was missing. She suggested that the money, which consisted of many new twenty dollar bills and some four hundred dollars in checks, be placed in the icebox used by the meat market, which is operated in connection with the store but by an independent owner. The money taken in by the meat market was customarily kept overnight in the icebox, which was locked with a padlock. Appellant would not accept the suggestion of Lorraine Bolt, whom he instructed to place the cash and checks in cash register No. 1. He said that he would come over to the store "right away" and open the safe.

Lorraine Bolt followed the instructions given by appellant. She and the other employees of the store, as well as the other employees of the meat market, left the premises about 9:15 p. m. Appellant and Lorraine Bolt were the only ones who had a key to the front door. The manager and employees of the meat market did not have a key. When all of the employees departed from the store, Lorraine Bolt locked the front door with her key. The manager of the meat market, one of the employees, and one John Roach were in

front of the store conversing for about fifteen minutes following the closing of the store, during which time nothing unusual happened.

After appellant received the telephone call from Lorraine Bolt, he departed from his home and immediately went to the store, where he arrived approximately 10:00 p. m. He testified that when he arrived he found the front door locked and that the rods holding the sections of the door in place were fastened to the floor. When he entered the store, it was dark. He turned on the lights, went over to get the money to place in the safe, and then saw that the box and the receptacle which were supposed to contain the money were on the counter with no money in them. He looked in the drawers for the money, but it was absent. He then opened the safe to ascertain whether the money was there, but it was absent therefrom. He immediately telephoned the treasurer of the Tradewell company and reported the disappearance of the money. The treasurer of the company testified that, at 10:20 p. m., appellant advised him by telephone the money had disappeared. The following day the amount of loss was ascertained to be $5,936.09. There is no evidence that any one other than appellant was in the store during the interval between 9:15 p. m. and 10:20 p. m.

Miss Bolt testified that June 15, 1944, the day before the disappearance of the $5,900, she was in charge of the store after 6:30 p. m., and that about 9:30 p. m., appellant called her on the telephone and inquired whether everything "was o. k.," to which she replied that she thought it was but to wait a minute. She then went to the safe, which she found locked so that she was unable to put away the day's receipts. She returned to the telephone and informed appellant of that fact. Appellant advised her to put the money in the drawer in the cash register, "to lock up and leave," and that he would come over and put the money in the safe. She suggested that she would stay until he arrived at the store, but he told her it was unnecessary. Thereupon she obeyed the orders, closed the store, locked the front door both with a key and padlock.

On an earlier occasion, another girl in charge found the safe locked when she got ready to close the store in the evening. She called appellant on the telephone to advise him of that fact and he instructed her to lock the store and go home saying he would come to the store and put the money away. She refused to do as directed and remained in the store until appellant's arrival. Appellant was permitted to continue as manager of the store until July 8th, at which time he was granted a vacation to which he was entitled, and told that his services were no longer required.

The state offered evidence showing that, shortly after the day the money disappeared, appellant made unusual and extravagant disbursements of money; whereas, immediately prior to that date he was so embarrassed financially as to necessitate the borrowing of money on his automobile. Within six weeks after the theft appellant expended in cash a total of $2,877 for the following purposes:

"A trip to Canada with lady friend, and purchase of a diamond ring for her .............................. $ 800.00
"Opening of a grocery store ........................ 1000.00
"Down-payment on a $2,000 Chrysler automobile ...... 572.00
"Four installment payments on a fur coat, two of which were delinquent ................................. 220.00
"Payments on automobile mortgage, which had several months yet to run ................................ 285.00

TOTAL ........................................$2,877.00"

Appellant insisted that those expenditures were made from three thousand dollars in cash which he always kept in his suitcase. He testified that three thousand dollars was saved by him from his salary while working in Colorado and California; that he had twelve hundred dollars saved in 1939 when he went to California, and that he saved eighteen hundred dollars while working in California from 1940 to 1943.

Appellant's former wife, Mrs. Barbara E. Hill, testified that in December, 1942, she saw approximately two thousand dollars in appellant's suitcase, and that in July, 1943, immediately prior to the time appellant came to Seattle,

she saw three thousand dollars in his suitcase. Appellant admitted that from February 11, 1944, to August 22, 1944, he deposited $3,429.62 in his bank account, while his salary during that period amounted to only fifteen hundred dollars. On the day of the theft, appellant's bank balance was $71.62. In 1938, appellant took voluntary bankruptcy in Denver, Colorado, which proceeding was not terminated until 1940, after appellant had gone to California. Appellant and Mrs. Hill, who was then his wife, at that time listed their liabilities as more than $5,500 and their assets as less than $250. It was proved at the trial that, in February, 1943, Mrs. Hill commenced an action for divorce against appellant, at which time she alleged that the only property of the parties was furniture of the value of $500 and an automobile of the value of $750. She obtained an interlocutory decree of divorce in June, 1943, but that decree makes no reference to any cash belonging to appellant.

Appellant was subjected to interrogation in the prosecuting attorney's office August 30, 1944, at which time he stated that his usual expenditures had come from three thousand dollars cash that he always kept in his suitcase. The prosecuting attorney caused a detective agency to ascertain from appellant's former wife, who had not at that time married Mr. Hill, whether she had ever known of any occasion on which appellant had kept any money in his suitcase. The operative, a Mr. Lacey, interviewed appellant's former wife at Oakland, California, August 31, 1944, and she stated to the operative that she had never known appellant to keep any money in his suitcase and that she did not believe any such story. Mr. Lacey was a rebuttal witness and his testimony controverts the testimony of appellant, as well as the testimony given at the trial by appellant's former wife, that appellant had, as he insisted, a cache of money in his suitcase.

In 1943, appellant still owed three hundred dollars on his furniture. In May, 1944, he was delinquent in installment payments for six hundred dollars for a coat he had bought his former wife. April 19, 1944, he borrowed $360 on his automobile, on which loan he paid in excess of ninety dol-

lars in interest. He admitted he had borrowed that money for the purpose of paying current bills. When arrested, he did not have one penny in his suitcase.

One of the checks which disappeared with the cash at the time of the theft was later placed to the credit of the Trade-well company by appellant. The undisputed evidence is that, during the late afternoon of Friday, June 16, 1944, Russell S. Kolemaine cashed his pay check in the amount of $63.17 at the Tradewell store, which check was cashed by Lorraine Bolt. That check, bearing the endorsement of the Tradewell store, was deposited with the Peoples National Bank of Washington, June 19, 1944. The morning of Saturday, June 17, 1944, appellant and the treasurer of Tradewell store made a list of all the checks which had not been stolen and were then in the store, and they totaled $975.17. The checks were listed by amounts, and the amount of $63.17 (the amount of the Kolemaine check) does not appear on the adding machine tape which was used in listing the checks then in the store.

Saturday, June 17, 1944, the officers of the Tradewell company arranged with the bank to obtain a two thousand dollar loan, repayment of which was to be made from the store's Saturday's receipts. By reason of the bank's early closing hour on Saturday, Tradewell company's district manager obtained a bag and lock from the bank, in which two thousand dollars of the Saturday's receipts was to be placed, and then the locked bag was to be deposited in the bank's night depository. This bag, unlocked, was given to appellant, who made the regular deposit of the store's Saturday business and a separate package containing two thousand dollars in cash and checks to repay the loan. After the bag had been locked by appellant, he, accompanied by the district manager, went to the bank and placed the locked bag in the night depository at the bank.

On Monday morning, June 19, 1944, appellant and the district manager went to the bank, where the district manager, who alone had a key to the bag, unlocked it. The regular deposit was made, and the money in repayment of the two thousand dollar loan was handed in at a different win-

dow.  The deposit slips showing the regular deposit made by the store June 16th, 17th, and 19th, do not list a check in the amount of $63.17; however, the Kolemaine check of that amount is shown to have been deposited at the bank June 19th as part of the money and checks which were deposited in repayment of the two thousand dollar loan, as will be shown by an examination of the list showing the items making up that amount.  This check was not among those found in the store the morning after the larceny.  The only person who could have placed it among the items that paid the two thousand dollar loan was appellant.  He had every opportunity during Saturday to place that check in one of the cash registers and to take out an equivalent amount in cash.  In that way the cash register would not be out of balance and appellant would receive the cash rather than the check.  Doubtless other stolen checks were disposed of in the same manner before appellant was discharged July 8th.

Appellant was lawfully in possession of more than $5,900 in cash and checks belonging to the Tradewell stores and that property was still in the store when it was closed for business the night of June 16, 1944.  About forty-five minutes after the store was closed, appellant arrived at the store, where he found all of the doors to the store locked and no evidence of any tampering with any of the means of ingress.  After he had been in the store for fifteen or twenty minutes, he telephoned the treasurer of his employer that the money of the store was missing upon his arrival there.  From the evidence, it is clear that no other employee of the store or of the meat market took the money.  The appellant, who was financially bankrupt prior to the theft, spent money prodigally after the disappearance of the money.  His explanation of the means by which he acquired the money which he spent so freely was disproved.

■■ Appellant contends that there was a fatal variance between the charge that he had stolen $5,900 in lawful money of the United States and the proof as the evidence disclosed that some of the property stolen was in

the form of checks rather than lawful money of the United States.

That $5,936.09, made up of cash and checks, was stolen from the store on the night of Friday, June 16, 1944, is admitted by appellant, who also concedes that there was sufficient evidence from which the jury could have found that at least $1,600 in lawful money of the United States was in the day's receipts which were stolen.

It was necessary for the state to prove only that appellant stole lawful money in excess of twenty-five dollars to sustain the charge of grand larceny. Under Rule XII of the Rules of Practice, an information shall be considered amended to conform to the evidence introduced without objection in support of the crime substantially charged therein unless the defendant would thereby be prejudiced in a substantial right.

Lorraine Bolt testified, without objection, concerning the amount of cash which was contained in the day's receipts which were stolen. It is conclusively established that approximately $1,600 in cash was stolen out of the last two thousand dollars given to her by appellant about 6:30 p. m., and that there was some cash, which was in the tills, from the three thousand dollars cash placed therein during the afternoon. The argument that the jury might have believed appellant's explanation of the source of the $3,500 he claims to have had, had the Kolemaine check not been admitted in evidence, is met by the evidence of the unusual cash expenditure of $2,877 by appellant rather than the $3,500. True, as argued by counsel for the state, the jury had the right to find from the small number of checks which were on hand Saturday morning June 17, 1944— those checks had been placed in the safe before appellant went home at 6:30 p. m.—that at least three thousand dollars in cash out of the five thousand dollar loan from the bank that afternoon remained in the cash register at closing time, and that the testimony of Lorraine Bolt as to the $1,600 in cash related only to the two thousand which was placed in the cash register at 6:30 p. m., and which was the portion remaining out of the five thousand dollars bor-

rowed in the afternoon. It was proper to show that the Kolemaine check, which was left with the money, was traced to the possession of appellant. It is only one of the many circumstances proving the guilt of appellant.

█ It is next argued that appellant was deprived of a fair trial because of the misconduct of the prosecutor in threatening one of the appellant's witnesses with prosecution for perjury and in injecting into the case his own personal belief regarding the veracity of the witness. This argument is based upon a question which the prosecutor endeavored to ask the appellant's divorced wife, a Mrs. Hill. A pertinent portion of the statement of facts reads as follows:

"Q. Do you understand, Mrs. Hill, that under the law of this state if a person testifies falsely on the witness stand— Mr. Booth: Your Honor—The Court: Yes, I will do the lecturing. The Witness: I haven't testified falsely. The Court: Sustained. Ask another question. Mr. Booth: That is clearly abuse. The Witness: I'm just telling what I know. The Court: Proceed. Ask another question. Mr. Kennett: May I have a recess and address the Court? The Court: The jury may retire to the jury room. (Whereupon the jury retired to the jury room.)"

The prosecutor was not permitted to complete the question, and he pursued the matter no further. Counsel for appellant insists, however, that after retirement of the jury to the jury room the prosecutor in his argument to the court threatened to charge Mrs. Hill with the crime of perjury while she was sitting in the courtroom, and that this was misconduct. During the argument of the prosecutor to the court, Mrs. Hill was present in the courtroom; but her presence was in violation of the court's order, in the beginning of the trial upon request of appellant's counsel, that all witnesses be excluded from the courtroom, counters counsel for the state.

The witness was not intimidated by the prosecutor. She did not change her testimony. The verdict reflects acceptance by the jury as true evidence which controverted her testimony. That the jurors may have been convinced by his conduct that the prosecutor did not believe the

testimony of witness Hill, does not of itself establish prejudicial misconduct by the prosecutor.

Error, if any, in a statement, or in his manner, by the prosecutor which may convince the jury as to the prosecutor's own belief in the guilt of a defendant or that a witness is not telling the truth, may not be assigned in the absence of a request for an instruction to cure it, and an exception taken to refusal to give instruction requested. See *State v. Melson*, 186 Wash. 8, 56 P. (2d) 710; *State v. Hatupin*, 190 Wash. 658, 70 P. (2d) 1039; *State v. Wright*, 199 Wash. 521, 92 P. (2d) 247; and *Vanderveer v. Hillman*, 122 Wash. 684, 211 Pac. 722. It is probable the jury did not believe the story related by witness Hill when it was met with ample credible rebuttal evidence which discredited this witness. The assignment that the prosecutor was guilty of prejudicial misconduct is without substantial merit.

█ On motion therefor, the state was permitted on the fourth day of the trial to endorse on the information names of two additional witnesses. This, counsel for appellant contend, constituted reversible error.

The testimony of the two witnesses (William P. McCarthy and Russell S. Kolemaine) was relevant as proof that the payroll check identified by McCarthy as one issued to Kolemaine and cashed at Tradewell stores was one of the checks stolen by appellant and deposited by him, as stated above, in lieu of the money (which he had stolen) represented thereby to the credit of his employer in the bank.

We are committed to the rule that in no event is the mere endorsement of additional names upon the information during the trial of itself reversible error, though it may be grounds for continuance at the instance of the accused, the denial of which, if requested, may be an abuse of discretion. *State v. Harding*, 108 Wash. 606, 185 Pac. 579.

Appellant's objection to the endorsement of additional names upon the information on the grounds that the application was not timely made, the testimony sought to be

elicited was not material or relevant, that it would constitute a fatal variance, and that appellant would be thereby prejudiced, is without substantial merit. Further, appellant did not request a continuance.

Finally, appellant contends that the court committed error in requiring appellant, in the presence of the jury, to claim the privilege of not having his wife Lucille McWhinney testify against him. The evidence discloses that, shortly subsequent to the discharge of appellant by Tradewell stores, he commenced living with one Lucille Evans, upon whom he squandered a large amount of money. During course of the investigation at the time of the trial, she was interrogated by the prosecuting attorney. She was subpoenaed by the state and appeared in court pursuant to that subpoena. When she was summoned from the hall by the bailiff and took the witness stand, appellant's counsel asked to have the jury excused without stating any reason for such request, which was denied. She was then asked if her name was Edna Lucille Evans and she responded that it was not; that her name was McWhinney. Thereupon the court excused the jury without any request therefor by appellant's counsel.

The state marked for evidence an application for a marriage license dated July 2, 1943, between Clair N. Evans and Edna L. Powell. The witness testified that she was the Edna L. Powell who signed that application. The state then marked for evidence a certificate showing marriage between Clair N. Evans and Edna L. Powell. The witness answered that she had never obtained a divorce from Mr. Evans, but that she had commenced an action for an annulment of marriage from him, but no hearing was had of the matter.

Appellant's counsel offered in evidence a document which purported to be a final decree of divorce between Daisy Pearl Evans and Clair Nelvan Evans, dated November 29, 1943, which was approximately four months subsequent to the date of the marriage between Evans and Edna Powell, the witness. Lucille Evans testified that she later entered into a marriage relationship with Mr. Evans.

Lucille Evans disclosed that she went through a marriage ceremony with appellant November 4, 1944.

This witness, prior to her marriage ceremony with Mr. Evans, was married to one Paul Powell when she was fifteen years old. She testified that Powell divorced her in Kansas City in 1941, but that she was never served with any of the papers and her testimony was based solely upon a newspaper clipping; that she had no proof of the fact that she and Powell were ever divorced.

Clair Evans, who was called as a witness, testified that he did not have a final decree of divorce from his wife in California at the time he married the witness Lucille Evans.

The court concluded that the witness, not having been legally married to Evans, he not being competent because not fully divorced from his wife, was free to contract a legal marriage with appellant. No consideration was given to the fact that there was no evidence that the witness had ever lawfully been divorced from her first husband, Paul Powell.

■ The state offered to prove by the witness that appellant bought her costly gifts shortly following the theft. The court declined the offer of proof but ruled that witness would have to identify herself on the witness stand as the wife of appellant before appellant could claim the privilege of not having her testify against him under the provision of the statute (Rem. Rev. Stat., § 1214 [P.P.C. § 38-9]).

In *State v. Frye*, 45 Wash. 645, 89 Pac. 170, we held that, where a defendant desires to object to a witness testifying against him on the ground that she is his wife, he should challenge her competency at the time she is sworn and try the question out before the court as an independent fact. In the case at bar, no claim was made to the court in the presence of the jury that the witness was the wife of appellant, and it would not have been error on the part of the court to have refused to send the jury to the jury room until such claim was made. It follows that no error was com-

mitted in requiring the appellant to object in the presence of the jury to the witness testifying upon the ground that she was his wife.

The judgment is affirmed.

BEALS, C. J., STEINERT, and JEFFERS, JJ., concur.

GRADY, J. (concurring in the result)—I concur in the affirmance of the judgment, but believe that it was not the proper practice to require the appellant to claim his statutory privilege in the presence of the jury.

