[No. 22501. Department Two. August 5, 1930.]

THE STATE OF WASHINGTON, *Respondent*, v. GEORGE
TURPIN, *Appellant*.[1]

[1]Reported in 290 Pac. 824.

*Attwood A. Kirby,* for appellant.

*Ewing D. Colvin* and *R. M. Burgunder,* for respondent.

HOLCOMB, J.—Appellant was tried, convicted and sentenced in the lower court of manslaughter. The charge of the information was that he, in King county, this state, on June 16, 1929, willfully, unlawfully and feloniously, with his hands and fists did strike, beat, knock down and otherwise assault one Yee Yen, a human being, thereby mortally wounding Yee Yen, of which mortal wounds Yee Yen then and there languished and died on June 16, 1929. The theory of the state was that the killing was without justification or excuse, while appellant claimed that he struck the blow in self-defense, and that the death was by unintended accident and misfortune.

Two boys, who were companions of appellant at the time of the affray, testified as witnesses for the state. The entire record has been read with care. The two companions of appellant, in some particulars, corroborated his testimony that he acted in self-defense. However, their testimony discloses that they were somewhat reluctant and evasive. Appellant testified that the Chinaman who was killed was apparently making threatening motions toward him, and that he was afraid of Chinamen and afraid that the Chinaman might have a knife; that the Chinaman ran toward him swinging his hands in the air, whereupon he "reached out and hit him, or rather, more pushed him than hit him," upon which the Chinaman fell down against the wall of the building and upon the concrete pavement of the sidewalk.

An entirely disinterested witness, a bus-boy in a hotel, testified that, between one and two o'clock on Sunday morning, June 16, he was walking east on Columbia street to Third avenue in Seattle, and at the southwest corner, in front of a drug store, he saw several boys, appellant and his companions, who were pulling garbage-cans around, making lots of noise and pushing each other around. He turned north, crossed Columbia and, on the opposite curb, met a lady and, about ten yards beyond her, met a Chinaman, whose actions were in no way unnatural. He walked a short distance further on Third avenue, and stopped to look in a window, when he heard a sound like someone falling. Upon looking back, he saw three boys running toward him north on Third avenue. These boys ran to the next street and turned down it, while he went back and found the Chinaman lying unconscious on the sidewalk of Third avenue, about fifteen feet north of the intersection with Columbia street. The Chinaman moved his hand slightly once, but could not talk.

Another disinterested witness, a reputable attorney of Seattle, testified that, at about that hour on that morning, he was walking down Third avenue to Columbia, and saw several men standing some distance from the corner. As he approached closer, three men commenced running toward him, two men were in advance and the third one was thirty or forty feet behind. They were apparently running as fast as they could, but, as they passed, one said "more lively." He observed them sufficiently to be able to describe them and their clothing. He walked a little further and saw the Chinaman lying on the sidewalk with his head against the building, some thirty or forty feet from Columbia street.

These two disinterested witnesses saw only three persons leaving the vicinity of the Chinaman where he

lay on the sidewalk. Appellant claimed that there were five, including himself, in the party.

The record also is to the effect that the Chinaman was about fifty-five years old, of small stature and very skinny; that he neither drank intoxicating liquor nor smoked opium; that, when found on the sidewalk, there was no odor of liquor on his breath. Earlier in the evening, he had visited a Chinese friend of his, whom he usually visited on Saturday evenings, and there had a lunch consisting of rice. When put in the police car to be taken to the city hospital, he commenced vomiting, and vomited undigested rice. Vomiting was stated by a physician-witness, who testified, to be a symptom and the result of a fractured skull. The testimony also was that the Chinaman died as the result of his skull being fractured at its base.

Police officers testified that, two months later, appellant told Prosecutor Colvin and a captain of police that he was in California at the time the Chinaman was killed, having left Seattle about the latter part of May or first of June, traveling by auto and train, and arriving in San Francisco about the 15th of June; that he stayed in California two months, when he returned to Seattle and denied that he knew anything about the death of the Chinaman. Another youth, a friend of appellant, testified that he was in the police station when appellant was being interrogated by a police lieutenant, in the presence of another lieutenant, and that he told the officers that he was in San Francisco at the time the Chinaman was killed; that later appellant told the witness that he had been rattled at the police station when he said he was in California, and that he was going to change his story when his trial came up.

Appellant testified in the trial and admitted that he had talked to Prosecutor Colvin and the police captain,

and, on the following day, had talked with two other police lieutenants. He admitted that he told the officers that he was in California at the time the Chinaman was killed, but claimed in his testimony that he made this statement because of the fact that one of the officers, Lieutenant Yoris, called him certain opprobrious names and vile epithets which made him angry; he offered no explanation of why he told the police captain the day before that he was in California at the time the Chinaman was killed, although he made no claim that that officer called him any vile or opprobrious names.

At the conclusion of all of the testimony, appellant challenged the sufficiency of the evidence and asked for an instructed verdict of "not guilty," which was denied and, in due time after the verdict, filed his motion in arrest of judgment upon the ground of insufficiency of the evidence and, in the alternative, for a new trial, which were denied. The denials of these several motions are assigned as error and argued as one.

Appellant insists that, since the burden was upon the state to introduce sufficient evidence to break down the presumption of innocence, and to justify conviction beyond a reasonable doubt, before appellant had to assume any burden of introducing evidence, and that, since it was shown by the state's own witnesses that the Chinaman was going toward appellant making some kind of motions with his arm, appellant had the right to act in self-defense; that it was conclusively established that he did no more than act under that right, and that his motion for a directed verdict should have been granted; or, if not, his motion in arrest of judgment after verdict.

Counsel for appellant concedes that the law is well established in this state that, when the killing is shown and self-defense is pleaded, it is incumbent upon the

accused to establish this defense. It is incontrovertibly established in this case, and, in fact, not seriously disputed by appellant, that Yee Yen came to his death by reason of a blow struck by appellant. The cause of death was a fractured skull, caused either by the force of the blow struck by appellant or by the force with which the Chinaman's head struck the building or the sidewalk.

Upon this state of facts, the sole question for the jury to determine was whether or not appellant was justified in striking the blow which he admits he struck. The jury had all the youths who participated in that affair before them, and, by their demeanor, manner of testifying and interest manifested in the defense, were warranted in deriving the reasonable inference that the other two youths, who were associated with appellant on that occasion, were endeavoring to shield appellant in giving as favorable a version to him of the occurrence as they could.

It was for the jury to decide from all the evidence and reasonable inferences where lay the truth.

Appellant cites our statute, Rem. Comp. Stat., §§ 2392 and 2393, defining murder in the first degree and murder in the second degree; § 2395, *id.*, defining murder as being any other homicide not excusable or justifiable; and § 2406, *id.*, providing that homicide is justifiable,

"In the lawful defense of the slayer, . . . when there is reasonable ground to apprehend a design on the part of the person slain to commit a felony or to do some great personal injury to the slayer . . . and there is imminent danger of such design being accomplished; . . ."

Section 2404, *id.*, is then quoted as follows:

"Homicide is excusable when committed by accident or misfortune in doing any lawful act by lawful means,

with ordinary caution and without any unlawful intent."

Section 2416, *id.*, is also quoted as follows:

"The use, attempt, or offer to use force upon or toward the person of another shall not be unlawful . . .

"(3) Whenever used by a party about to be injured . . . in case the force is not more than shall be necessary; . . ."

The trial court correctly charged the jury that manslaughter is the unintentional killing of a human being, done, without excuse or justification, by a person while engaged in the commission of an unlawful act not amounting to a felony, or in doing a lawful act in a grossly negligent manner; that, in order to constitute manslaughter, it is not necessary that there be either premeditation or an intent to kill. The court instructed the jury as to what constitutes excusable homicide, according to the definition of § 2404, *supra*. It also instructed them as to what constitutes justifiable homicide as defined in §§ 2406 and 2416, *supra*.

■ Appellant was prosecuted for the least form of homicide. We have uniformly held that every homicide, when proved beyond a reasonable doubt, or admitted, is presumed to be murder in the second degree, and the burden is upon the accused to reduce it to manslaughter, or justify it.

*State v. Payne,* 10 Wash. 545, 39 Pac. 157; *State v. Melvern,* 32 Wash. 7, 72 Pac. 489; *State v. Clark,* 58 Wash. 128, 107 Pac. 1047; *State v. Ware,* 58 Wash. 526, 109 Pac. 359; *State v. Totten,* 67 Wash. 192, 121 Pac. 70; *State v. Drummond,* 70 Wash. 260, 126 Pac. 541; *State v. Hawkins,* 89 Wash. 449, 154 Pac. 827; *State v. Duncan,* 101 Wash. 542, 172 Pac. 915; *State v. Cook,* 126 Wash. 81, 217 Pac. 42; *State v. Tyree,* 143 Wash. 313, 255 Pac. 382; *State v. Gruber,* 150 Wash. 66, 272 Pac. 89.

It is true appellant was not charged with either murder in the first or in the second degree, but only with manslaughter. He was not, therefore, required to justify as to either degree of murder or reduce the guilt to manslaughter.

Under the evidence presented in this case, it being necessary for the state to produce the evidence of the other participants with the appellant in the affair that resulted in the death of Yee Yen, we are satisfied that it was a question for the jury to decide whether or not appellant was the aggressor and, therefore, was guilty of manslaughter.

█ Appellant next complains because the court refused his requested instruction phrased in the precise language of the statute, above quoted, covering justifiable homicide. Instead thereof, the court gave the following instruction:

"The killing of a human being is justifiable when committed in the lawful defense of the slayer when there is a reasonable ground to apprehend a design on the part of the person slain to do some great personal injury to the slayer and that there is imminent danger of such a design being accomplished. A person may act in the protection of himself upon circumstances as they reasonably and honestly appear to him at the moment; and if he does act honestly and reasonably as the danger appears to him at the time under all the circumstances, the law will not hold him responsible, even though he was guilty of misjudgment and exaggeration of the danger as it actually was. It is not necessary that such danger should actually be imminent, but it is necessary that person menaced have reasonable ground for believing, and that he does honestly believe, that such danger actually exists. *When a defendant claims that he killed another in self-defense of his own person, the burden is upon the defendant to prove that the homicide was done in self-defense. It is not necessary for the defendant to prove this to you beyond a reasonable doubt, nor by a preponderance of*

*the evidence. The defendant sustains this burden of*
*proof if from a consideration of all the evidence in the*
*case you have a reasonable doubt as to whether the*
*killing was done in self-defense.''*

Appellant asserts that he was entitled to have jus-
tifiable homicide defined to the jury in the words of
the statute, and that an instruction thereon in the lan-
guage of the statute is sufficient. 30 C. J. 365.

He contends further that the italicized portion tends
to mislead and confuse the jury; that it assumes that
appellant claimed he killed the decedent in self-defense,
whereas appellant contends that the death itself was
due to accident and misfortune; that it denies appellant
the defense of excusable homicide; that the jury may
well have thought that the burden was upon appellant
to prove his innocence by his own witnesses, the state
having used the only two witnesses to the affray; that
the term ''burden of proof'' is a rule of evidence to
govern the court and if used its meaning should have
been fully explained.

We cannot give assent to these criticisms and inter-
pretations of the instruction. The defense of excus-
able homicide was covered by another instruction. As
shown by the authorities above cited by this court, it
has always been the law in this state that the burden
is upon the defendant who claims that he killed an-
other in self-defense to show from all the facts and
circumstances that it was done in self-defense. We
have, also, limited that rule in those cases and others
so that defendants in such cases are not deprived of
the benefit of the reasonable doubt and the presumption
of innocence rules. *State v. Rosi,* 120 Wash. 514, 208
Pac. 15; *State v. Johnson,* 122 Wash. 394, 210 Pac.
774; *State v. Pistona,* 127 Wash. 171, 219 Pac. 859;
*State v. Fitzpatrick,* 141 Wash. 638, 251 Pac. 875.

In the oral argument before us, appellant cited as
an additional authority, and relies strongly upon the

recent case of *State v. Rouw,* 156 Wash. 198, 286 Pac. 81.

In that case, the trial court had given an instruction as to the presumptions arising by statutory provisions when the possession of intoxicating liquor has been shown beyond a reasonable doubt, and concluded the instruction as follows:

" . . . Such presumptions, however, may be rebutted. The burden of rebutting such presumptions by evidence sufficient to raise in your minds a reasonable doubt as to his intent in the possession of such intoxicating liquor is upon any party so proved by the evidence beyond a reasonable doubt to have been in the possession of such liquors other than alcohol."

On appeal, this court held with the trial court that the instruction was erroneous, and affirmed the trial court in ordering a new trial.

There is a wide distinction between the instruction given in the *Rouw* case, *supra,* and that here. The instruction in the *Rouw* case virtually charged the jury that the defendant must offer some proof of the intent with which he had the liquor, and, if the defendant did not take the stand, it would practically compel a conviction.

In the instant case, no such inference can be drawn from the instruction, because the jury were explicitly told that appellant was not compelled to prove that he acted in self-defense, beyond a reasonable doubt, nor by a preponderance of the evidence, but that it was sufficient if, from a consideration of all the evidence in the case, a reasonable doubt was created as to whether or not the killing was done in self-defense.

The instruction is in harmony with the language and spirit of all our decisions since the *Payne* case, *supra,* in 1895. The decision in the *Rouw* case, *supra,* has no application here.

113

■ Appellant's third claim of error is that the court erred in giving the following instruction to the jury:

"You are instructed that no man can by his own lawless acts create a necessity for acting in self-defense and thereupon assault and injure or kill the person with whom he seeks the difficulty, and then interpose as a defense the plea of self-defense. Self-defense is the plea of necessity as shield only to those who are without fault in occasioning an affray, and acting under it. Therefore, if you find from the evidence beyond a reasonable doubt that the defendant was the aggressor and that by his own acts and conduct he provoked or commenced the affray, then the plea of self-defense is not available to him."

Appellant asserts that the above instruction is vicious because it assumes a state of facts with no evidence whatever to support the statement.

The instruction was in harmony with the theory of the state that appellant himself was the aggressor. *State v. McConaghy,* 84 Wash. 168, 146 Pac. 396; *State v. Hawkins,* 89 Wash. 449, 154 Pac. 827; *State v. Hoyer,* 105 Wash. 160, 177 Pac. 683.

There was no error in giving the instruction.

■ The fourth and last complaint of appellant is that the court erred in permitting an officer to testify that he called appellant a "rat" and in stating that appellant had always been a rat, and refusing to strike the testimony and instructing the jury to disregard it. This complaint is based upon the testimony of police lieutenant Yoris, heretofore mentioned. The record shows that, upon motion of counsel for appellant, the statement made by that officer, to the effect that he had known appellant for years and that he always was a rat, was stricken by the court and the jury instructed to disregard it. One of the companions of appellant had preceded the police officer on the witness stand, and had testified on cross-examination by appellant's

114

counsel that he heard Lieutenant Yoris call appellant unmentionable and vile epithets. Lieutenant Yoris was thereafter put upon the witness stand and attempted to give the exact conversation had with appellant. That was perfectly competent and proper. His statement as to what his knowledge of appellant theretofore was, the trial court properly struck, and instructed the jury to disregard it. There was no error in that matter.

We find no reversible error, and the judgment is affirmed.

MITCHELL, C. J., MAIN, FULLERTON, and FRENCH, JJ., concur.

[1]Reported in 290 Pac. 864.