[No. 30261.   Department Two.   December 11, 1947.]

THE STATE OF WASHINGTON, *Respondent,* v. DAN HOGAN,
*Appellant.*[1]

'Reported in 187 P. (2d) 612.

*John W. Brisky* and *Rummens & Griffin,* for appellant.

*Reuben C. Youngquist* and *Charles F. Stafford, Jr.,* for respondent.

JEFFERS, J.—This is an appeal by defendant, Dan Hogan, from a conviction and sentence of assault in the second degree. The original information charging defendant with the crime of assault in the first degree was filed in the superior court for Skagit county on March 8, 1946. An amended information also charging defendant with assault in the first degree was filed June 14, 1946. Defendant entered a plea of not guilty to the amended information.

The cause came on for trial before the court and jury on October 30, 1946, and thereafter, on November 1st following, the jury returned a verdict of guilty of assault in the second degree. Defendant timely filed motions for judgment notwithstanding the verdict and for a new trial. The motions were denied by an order entered May 5, 1947, and on the same day judgment was entered on the verdict, and sentence pronounced. Counsel for defendant, in open court, gave due notice of appeal, after sentence had been imposed and the judgment and sentence signed by the court.

Defendant makes the following assignments of error:

"1. The court erred during the trial in permitting the endorsement of the name of a witness on the amended information who testified in chief.

"2. The court erred in giving instruction No. 3, as follows:

" 'By stipulation of counsel for the State of Washington and for the defense, and by order of the court, the crime of assault in the first degree has been withdrawn from your consideration, and you will consider in your deliberations the crime of assault in the second degree only.'

"3. The court erred in refusing to give requested instruction No. 1 as follows:

" 'There has been no proof of assault in the first degree or in the third degree, and the court has withdrawn those charges. Hence, you will find the defendant guilty or not

guilty of assault in the second degree only.'

"4. The court erred in giving instruction No. 15 as follows:

" 'You are instructed that no man can by his own lawless acts create a necessity for acting in self-defense, and thereupon assault and injure the person with whom he seeks the difficulty, and then interpose as a defense the plea of self-defense. Self-defense is a plea of necessity as a shield only to those who are without fault in occasioning an affray and acting under it. Therefore, if you find from the evidence beyond a reasonable doubt that the defendant was the aggressor and that by his own acts and conduct he provoked or commenced the affray, then the plea of self-defense is not available to him.'

"5. The court erred in giving instruction No. 17 as follows:

" 'Legal self-defense when urged as a defense to a charge of assault, is a complete defense or no defense at all, that is to say, such never suffices merely to mitigate the crime or to reduce what would otherwise be a higher degree of crime to the lesser one.'

"6. The court erred in denying appellant's motion for a new trial."

Appellant states in his brief:

"The assault was admitted by the appellant and the plea was that of self-defense and defense of another."

■ Under the first assignment of error, it is contended the trial court erred in permitting the state to endorse the name of Captain Austin Jacob Walter upon the information during the trial, and in permitting this witness to testify for the state, not in rebuttal, but in chief, citing Rem. Rev. Stat., § 2050 [P.P.C. § 131-1], and *State v. Bashor,* 175 Wash. 230, 27 P. (2d) 121, to sustain his contention.

It will be recalled the trial started on October 30, 1946. On the opening of court on October 31st, Mr. Fowler, deputy prosecuting attorney, requested permission to endorse the name of Captain Walter on the information. Counsel for appellant objected, on the ground that the application was made too late; that it should have been made at least at the beginning of the trial. The court permitted the name to be endorsed on the amended information. No claim of

surprise was made by counsel for appellant, and no application was made for a continuance at that time, or at the time the captain was called to testify.

The *Bashor* case, *supra,* holds that the names of witnesses used by the state in rebuttal need not appear on the information. Nothing is said in the cited case relative to when the name of a witness used in the state's case in chief must be endorsed on the information.

In *State v. McWhinney,* 23 Wn. (2d) 334, 161 P. (2d) 162, the state, on the fourth day of the trial, was permitted to endorse on the information names of two additional witnesses. It was contended by the appellant in the cited case that the court erred in permitting the names to be so endorsed. In discussing the question, we stated:

"We are committed to the rule that in no event is the mere endorsement of additional names upon the information during the trial of itself reversible error, though it may be grounds for continuance at the instance of the accused, the denial of which, if requested, may be an abuse of discretion. *State v. Harding,* 108 Wash. 606, 185 Pac. 579."

We are of the opinion the trial court committed no error in permitting the name of Captain Walter to be endorsed on the information, or in permitting him to testify in the state's case in chief.

It is next contended the court erred in giving instruction No. 3, hereinbefore set out. The following exception was taken to the above instruction by counsel for appellant:

"Defendant excepts to instruction No. 3 as given by the court because it uses the language 'that by stipulation of counsel for the state of Washington and for the defense' as being erroneous, and particularly prejudicial to the defendant because by the use of the term 'stipulation' the jury is authorized to believe, then, that if the defense stipulated as to first degree and third degree, that the stipulation carries all the way through, and that there would be sufficient evidence by stipulation of counsel for the jury to convict upon second degree."

Appellant contends:

"First: That in a criminal case counsel cannot 'stipulate' away any right of a defendant; and

"Second: Under no circumstances was the court justified in advising the jury of any such 'stipulation.'"

At the close of the state's case, counsel for appellant challenged the sufficiency of the evidence to warrant submission to the jury of assault in the first degree and assault in the third degree, and moved that the crime of assault in the first degree and the included crime of assault in the third degree be removed from the consideration of the jury.

In arguing the above motion, counsel for appellant stated, as shown by the statement of facts:

"We consider it would be an error to permit either assault in the first degree, or assault in the third degree to go to the jury, or be considered by the jury, because the state's case establishes very definitely to date the absence of any showing of self-defense.

"Assault in the second degree as defined by the statutes, and as would be defined in the instructions, and as we have submitted instructions thereupon, and so moving, the defendant asks leave to withdraw all instructions submitted covering first degree assault and third degree assault, and leaving for the submitted instructions only assault in the second degree, because under the statute there cannot be any right to speculate there was an intent to kill under all the evidence given here, and the state has proceeded to go ahead and prove assault in the second degree, and by proving assault in the second degree under the evidence to date, has eliminated third degree."

The trial court was apparently in doubt about its right to grant appellant's motion, for, after argument of counsel for appellant, the court stated:

"Now, then, with the evidence, what is bothering the court at this time with the evidence as it is here, and the jury being the sole judges of the facts in this case, would the court be justified in withdrawing at this time, that issue from the jury? What have you to say about that?"

To this question, counsel for appellant replied:

"My only answer to that is that I view it as a matter of law that the court must withdraw it from the jury; that if it is submitted to the jury, and assume the jury does not bring in a verdict of first degree, but brought in a verdict of second degree, only, yet having submitted first degree

to the jury where there is no evidence of intent, we will have a verdict that can be upset because of the erroneous submission of first degree. * * * My answer to your question is that to submit first degree even if they brought in a lesser verdict, would constitute error."

It appears from the statement of facts that counsel for appellant argued at considerable length on his motion, that none of the argument was based upon the stipulation which is referred to in appellant's brief and which at that time had not been entered into, but that he was insisting that his motion be granted as a matter of law.

At the opening of court in the afternoon of the day on which the above motion and argument were presented, counsel representing the state made the following statement to the court in the absence of the jury:

"MR. BOOTH: May it please the court and counsel, we would like the record to show that by stipulation of counsel for the defense and the prosecution, we have agreed, subject to the order of this court, that assault in the first degree and assault in the third degree be withdrawn from the consideration of the jury, and that it be submitted on second degree alone. Is that correct, Mr. Griffiin? MR. GRIFFIN: That is correct. THE COURT: Very well, the record may so show."

Appellant cites no authority to sustain his contention relative to this assignment of error.

As an abstract proposition, it may or may not be true that counsel for defendant in a criminal case cannot "stipulate" away *any right* of a defendant. See *State v. McNeil,* 161 Wash. 221, 296 Pac. 555.

It is apparent, from the portion of the record which we have set out, that counsel for appellant was insisting that the court must, as a matter of law, withdraw from the jury any consideration of both first- and third-degree assault.

We are satisfied that the trial court, as a matter of law, was required to withdraw from the consideration of the jury first- and third-degree assault; in other words, that, under the evidence, if appellant was guilty of any crime, it was assault in the second degree only. It may be that the trial court inaptly inserted in instruction No. 3 the words

"by stipulation of counsel for the state of Washington and for the defense," but instruction No. 3 also says "by order of the court."

Appellant states in his brief that his motion to remove first- and third-degree assault from the consideration of the jury was well taken, and should have been granted. That was in effect what the court did, and, by instructing the jury that they could consider only the crime of assault in the second degree, both first- and third-degree assault were removed from their consideration. Assuming for the purpose of argument only that counsel for appellant could not stipulate to the withdrawal of first- and third-degree assault, it being our opinion that there was no evidence to support either first- or third-degree assault, no right of the appellant was stipulated away.

We cannot agree that by instruction No. 3 the jury might have received the impression that counsel for appellant acquiesced in and would agree to a conviction of second-degree assault. Further, it is impossible for us to believe that the jury ever could have thought that appellant was at any time acquiescing in a conviction of second-degree assault, in view of the very earnest defense interposed in this case.

After an examination of the record, including the other instructions given by the court, we are of the opinion that the jury could not have been misled by instruction No. 3; that they were clearly informed by other instructions that they could consider only assault in the second degree; and that, before they could find appellant guilty of that crime, they must find that all the elements of second-degree assault, as defined by the court, had been proved beyond a reasonable doubt. We find no reversible error in instruction No. 3.

■ Assignment of error No. 3 is based upon the refusal of the court to give requested instruction No. 1, as hereinbefore set out. We find no merit in this assignment. Counsel for appellant took his exceptions to certain instructions given by the court, as appears from the statement of facts.

After taking such exceptions, he stated: "There are no exceptions to the refusal to give instructions."

We shall next discuss assignment of error No. 4, which is based upon the giving of instruction No. 15, hereinbefore set out, and particularly the following part of such instruction:

"You are instructed that no man can by his own lawless acts create a necessity for acting in self-defense."

Appellant admits that the above portion of instruction No. 15 is a fair statement of the law, but contends that "there was no evidence or inference from evidence that appellant 'by his own act' created or attempted to create, 'necessity for acting in self-defense.'" This requires a discussion of the evidence.

In the case of *State v. Turpin*, 158 Wash. 103, 290 Pac. 824, the court gave an instruction exactly like instruction No. 15 herein complained of, except that in the cited case the instruction contained the words "or kill," which words are not found in instruction No. 15. In the cited case, objection was made to the instruction, on the ground that it was vicious because it assumed a state of facts with no evidence whatsoever to support the statement. We said:

"The instruction was in harmony with the theory of the state that appellant himself was the aggressor. [Citing cases.]"

It was the theory of the state in the instant case that appellant was the aggressor. We appreciate that the crucial point raised by appellant relative to instruction No. 15 pertains to the question of whether appellant or Noble was the aggressor in the assault, but we are of the opinion that the acts and conduct of Noble from the time he entered the cafe up to the time of the assault also have some bearing on the probability of Noble having acted and used the language it is claimed he did toward the owner of the cafe, Mrs. McIntosh, and appellant.

The state called as its witnesses Mr. and Mrs. Huntley Gordon, Nels E. Isaacson, Harold W. Wells, Harlan A. Warriner and his daughter, Dorothy Lou Warriner, Grace L.

Adams, Joseph F. Barker, DeForest R. Watkinson, Thomas Bulmer, and Eva May Bulmer, his wife. It appears from the record that the above-named persons are all of the patrons of the cafe who were present on the evening of March 6th, during the time Noble and his friend were in the cafe, with the exception of John Detraz, Noble's friend, who had been transferred to San Francisco a few days before the trial, and Mrs. Harlan Warriner, who, her husband testified, was ill and unable to appear at the trial.

Some of the witnesses had noticed Noble and his friend playing the slot (pinball) machines as they entered the cafe. All of the witnesses were in the cafe for the greater part of the time Noble and his friend were there. Some of them, for one reason or another, paid more attention to the boys than did others, but not one of these witnesses saw or heard Noble or his friend do or say anything out of the way; in fact, the testimony of all the witnesses was to the effect that these boys were unusually quiet and conducted themselves like gentlemen. None of the witnesses testified that Noble or his friend showed any evidence of intoxication. Their testimony was that the boys caused no disturbance of any kind, and that, so far as any of them heard a conversation between Noble and Mrs. McIntosh, or Noble and Mary DeMers, the waitress, Noble said nothing in any way offensive to either of those ladies.

All of these witnesses were disinterested. None of them knew or had ever seen Noble or his friend previous to the night in question. Some of them apparently knew Mrs. McIntosh, and some of them did not. The first thing any of the witnesses noticed that was unusual on the part of Noble was when he picked up his steak in his fingers and walked out into the kitchen. We shall later refer to what some of the witnesses saw and heard after Noble went into the kitchen.

The following is the material part of Noble's testimony relative to his actions from the time he entered the cafe until after the assault. On March 6, 1946, Noble was twenty-two years old, weighed about one hundred fifty-four pounds,

and was five feet eight inches tall. He was in the navy, rated aviation first class, and was stationed at Ault Field, on Whidby Island. Noble and his friend, John Detraz, arrived in Mount Vernon the afternoon of March 6th, about two p. m. They were looking at cars, and, during the afternoon and up until about eight-thirty p. m., at which time they entered the cafe, Noble said he had consumed eight beers.

Mac's Cafe, where the assault took place, is between Mount Vernon and Burlington. The two young men arrived at the cafe about eight-thirty. They entered the front part of the cafe, in which there is a bar and some pinball or slot machines. Noble played these machines for ten or fifteen minutes, after which the boys went into the dining room, and both boys ordered steaks. When Noble's steak was brought in, it was so tough that he could not eat it, or even cut it. The waitress, Mary DeMers, came by, and he asked her about the steak. She told him to see the proprietress, Mrs. McIntosh. Noble testified he had no conversation with the waitress other than as above stated. Noble then went over to the proprietress, who was at the cash register, and asked her about the steak, but she did not say much. He paid her for his steak and went back to his table. He sat down for a minute and then picked up the steak in his fingers and took it out to the kitchen.

There is a swinging door between the dining room and the kitchen. Noble went through this door and took two or three steps into the kitchen, at which time he saw Hogan standing at the end of the dishup table. Noble started to ask Hogan about the steak, when the door opened behind him, and he turned around to see who had come into the kitchen and saw that it was the proprietress. While he was turned around, something hit him and he did not know what had happened for a while. At the time he was hit, Noble was facing the swinging door. He was dazed by the blow, but came to enough to realize that he was being hit over the head, and he heard something rattling. When he came to, his feet would not move, and then he "went out"

again. He remembered being struck on the head and trying to protect himself with his left arm. He had no idea of how many times he was struck, but thought he was hit at least six times before he called for help. Noble was not knocked down, but, as he stated, he was "out on his feet." The next he remembered was being across the street at a filling station, and some woman was telling him he was bleeding. He was taken to a hospital in Burlington, and from there to a hospital at the base, where he remained for two weeks His left arm was broken and his head was lacerated. He had fifteen stitches taken in his head wounds, and his arm was in a cast for a month. He stated that he had no conversation with either the proprietress or the waitress, other than as stated.

Noble was subjected to a very thorough cross-examination. He denied that he ever grabbed the proprietress by the dress, or called her a vile name, or struck her. He denied that he ever struck Hogan or knocked him down, but stated that if he did strike him he had no recollection of it, and that if such occurred, it was after Hogan struck him and during the affray which followed.

Dr. Walter was the witness whose name appellant objected to having endorsed on the information. He was in the navy, and stationed at the air base on Whidby Island. He saw and examined Noble on March 7th. The doctor stated that Noble had fourteen or fifteen rather deep one-inch-long wounds on the scalp, and that there was some concussion due to these wounds; that he had a simple fracture of the left forearm.

The material part of appellant's testimony is substantially as follows: Hogan was not sure of the date of his birth, but thought he was born in 1881. He was about five feet ten inches in height, and weighed one hundred eighty-five pounds. He had followed mining, logging, and engineering. He was in the navy in the first World War and, after his discharge, was in the Seattle police department, from 1919 to 1928. On direct examination, he admitted having been

convicted of permitting a prisoner to escape. Hogan had known Mrs. McIntosh for about four years, and, while he was not a cook by profession, he was acting in that capacity on the night of March 6th.

Hogan described in considerable detail the interior of the kitchen, and where the different objects were located, including certain knives which were on the chopping block. The first Hogan saw of Noble was when the latter came into the kitchen carrying the steak in his hand. Hogan at that time had a bad burn in the center of his right hand, and he had cut his left hand with an axe, the cut having become infected and caused what he described as a felon. He had had this felon treated by Dr. Lloyd, and his left hand was bandaged on the night in question.

When Noble came through the door, Hogan was standing back of the serving table, and there was no one else in the kitchen. Hogan was asked to state to the jury just what occurred, both as to conversation and action.

"A. I gasped when I saw him with the steak in his hand. I said, 'What is the trouble, sailor?' and he said, 'What kind of a so and so are you that you would sell me a steak like this?' I passed over the insult and I said, 'Lay it down and we will see what is wrong with it.' He said, 'It is so tough I can't cut it with a knife.' I said, 'Let's see it.' I reached up and took the small steak knife, it is very sharp and that is used for the diners. Q. That is the knives you set out for the customers? A. Yes sir. I gave it a slice and I said, 'It looks all right. If you aren't satisfied we will give you your money back, if you locate the Missus we will give it to you.'

"Q. Now, as you were cutting the steak, what occurred? A. Mrs. McIntosh spoke up and told him to get his money from the girl. Q. You two were alone, you said, at the time that the sailor came in, and when you first saw him; when did Mrs. McIntosh come in? A. I couldn't tell you; the first thing I heard her voice. I was talking to the boy, it couldn't have been a minute, or half a minute, but she was standing right at the center of that serving table. Q. Right alongside of the boy? A. No, the boy was over toward the end where I was, then he walked around when she came in, he walked away, he would not watch me cut the steak. Q. And you heard her voice, and what was said? A. She told him to

go to the girl and get his money. Q. What did he say or do? A. He called her a name. Q. What did he call her? A. He called her an old bitch and ordered her out of the kitchen. Q. What did he do? A. Struck her; I couldn't just see, but I was by that time starting around the table and I saw her go backwards, and then the next thing I saw before I got to him, he had hold of her across the front of her dress. Q. What did he do or say when he had hold of her? A. I don't know, I was in such a hurry to grab him. . . . Q. Did you pick up anything as you went around [the table]? A. No sir. . . . Q. What was your purpose in going around? A. I wanted to pull him away from Mrs. McIntosh. . . . Q. Did you ever see Mary [DeMers] at the telephone? A. No, I don't think I did. I can't remember if I did."

The witness was then asked to tell what occurred.

"A. When I reached for him— Q. Was that with your bare hands? A. Both hands, yes sir. Q. And one of them bandaged? A. Yes sir. I reached for him to grab him and I don't know what happened, but I shook my head, and I was in a chair, my eyes kind of jarred and I was shaking my head clear. Q. Where had you been struck? A. At first in the mouth."

The witness then stated that as a result of the blow he had to have one tooth extracted and another one was loose. Continuing his testimony, the witness stated that he made a lunge for Noble and

"A. Well, I hit on my pants on the floor. Q. Did anything hit you first? A. I don't know what it was hit me, but I was down. Q. Did he hit you? A. I imagine he did; I had a nice black eye."

Hogan further stated that he was knocked down between the sink and the serving table; that Noble ran at him to kick him and did kick him in the shins; that he kicked Noble and then got hold of the drainboard on the sink and pulled himself up, and the chain (state's exhibit No. 12) was right there in front of him; that he pushed the chain off the hook and started slashing with it; that Noble kept swinging and Hogan kept slashing at Noble's hand with the chain, which he was holding in the middle; that Noble backed him into the pantry and then he fought his way out of the pantry.

"Q. And what occurred, let us say, up until the time that you reached the kitchen door? A. He [Noble] shouted 'Doc' 'Doc' 'Doc', that is a stock phrase, Mack or Doc, in the Navy, and as quick as he quit swinging I quit. . . . Q. Did he quit swinging, however, until you got him back to about the kitchen door? A. No, I backed him around toward the door, and I kept slashing the chain like this, making a lot of noise with it, and shouting, and I had him on the run, and I was looking every minute for his partner to come in. I know he backed through the door, I couldn't tell you whether Mrs. McIntosh opened the door or not, but he went through the door. Q. At some stage of that proceeding you apparently hit him on the head, do you know how that occurred? A. I would not, sir. I kept swinging, I was slashing at his hands to keep him from hitting me. Q. Did you deliberately hit him on the head? A. No sir."

Hogan stated that he did not use any more force than he thought was necessary, and that he did not strike Noble in the dining room. Hogan followed Noble to the outside door, then came back to the kitchen and hung up the chain. He further testified that Noble and his friend had a pint bottle of whiskey, saying, "That is, I imagine it was whiskey, there was a little in the bottom of it."

On cross-examination, Hogan was asked:

"Q. As you followed Noble out to this door did you not strike him twice over the head, in the open doorway? A. I never intended to strike him over the head at all. . . . Q. I said did you, or did you not? A. I told you I struck at his arms. Q. Did the chain accidentally strike him on the head? A. I don't know, I couldn't tell you. Q. You do not know? A. No sir."

Mrs. McIntosh's testimony as to what occurred in the kitchen after she arrived there was in substance the same as that of Hogan. We would like to refer to some of Mrs. McIntosh's testimony relative to the time Noble approached her in the dining room and asked her about the steak. She stated that Mary DeMers told her the sailor at the desk wanted to speak to her, so she stopped at the desk. Her testimony continues:

"I said, 'Are you having some trouble, son?' He said, 'Yes, I am, my steak is tough.' Of course you know we—

Q. All I want is what occurred at that time with the boy.
A. So I said, 'Would you like something else on the menu?'
I named over what we had and he shrugged, and he said
'No.' And I knew he wasn't hungry, he wasn't interested in
eating, he just wanted to be seen— [Objection by Mr.
Fowler] Q. Describe the manner of the boy as he was
talking to you, if you can? A. The object of his coming up
there in the beginning was not the steak. MR. FOWLER:
That is a conclusion. THE COURT: Just tell what you ob-
served. Q. Just what he did, how he acted, you reached a
conclusion about it, tell the jury what the basis of his actions
were that caused you to reach that conclusion? A. His strut-
ting attitude, he wasn't uneasy, or wasn't mean or obnox-
ious, but he was strutty—'Look me over, Girls, here I am'
attitude."

Mary DeMers stated that she followed Mrs. McIntosh
into the kitchen, and the first thing she heard was Hogan
saying, "Fellow, that steak seems tender to me." At this
time, Hogan was cutting the steak on the serving table, and
Mrs. McIntosh was standing at the edge of the serving
table. The witness next heard Mrs. McIntosh say, "Listen,
I told you the girl would refund your money."

"Q. What did the sailor do? A. He hit her with the heel
of his hand and called her a vile name, and said, 'If it wasn't
for your old age I would hit you in the face.' And he
grabbed her by the front of the dress."

Miss DeMers further stated that after Noble grabbed
Mrs. McIntosh, she (Miss DeMers) went to the telephone
to call the police, but could not get her number; that as she
turned to the telephone, her back was to the other people
in the room; that she heard a crash, turned around and saw
Hogan in a chair with blood running out his mouth; that
she then got out of there and went into the dining room.
She stated that she did not see Hogan strike Noble at any
time; that she did not see the chain in Hogan's hand until
he and Noble came out of the kitchen. The witness also
testified that Hogan had a felon on his left hand, and that
the hand was bandaged; that his right hand was burned.
She also stated that she saw Hogan's shins and they were
bleeding.

We desire again to refer to Mrs. McIntosh's testimony. She stated that after the trouble was over she went into the kitchen and found Hogan there.

"Q. What was Hogan's condition immediately afterwards? A. He was sitting there, seemed dumfounded, and I got a cold towel and mopped up the blood to find out what his injuries had been. Q. Did you mop up any blood off Mr. Hogan? A. Yes. Q. From whereabouts? A. His face was quite covered with it, his hair had fallen down and it had gotten sopped too; he was blood all over, and all over his garments."

Albert Ginnett, called by appellant, testified that he saw appellant the Sunday afternoon before March 6th, and that "He had one hand—on a thumb and the center finger, a bandage on it"; that he saw Hogan about three days after March 6th, and that Hogan at that time had a tooth missing and a "kind of a bruise on the side of his head"; that Hogan showed him black and blue marks on his shins.

We now desire to refer specifically to some of the testimony given by the witnesses for the state relative to what they saw and heard after Noble went into the kitchen.

Huntley Gordon, who is in the insurance business and lives in Mount Vernon, stated that after Noble went into the kitchen the next he heard was a "sort of a plaintive voice" from the kitchen calling a name. He could not say what the name was. The call was weak, "as if somebody were in desperate pain." He got up and started toward the kitchen door, and when he was about halfway there the door was forced open

". . . by the body of Noble. He was pretty well out on his feet, and as he naturally came into view first and then Hogan came into view, Hogan had him by the nape of the neck and he had the chain in his right hand. Q. You observed the chain, did you? A. Yes sir. Q. Would you describe it? A. It was a heavy link chain which, just off-hand, I would say would probably be used in a— [Objection by counsel for appellant, sustained.] Q. Just describe the appearance of the chain? A. It was a chain about eighteen inches in length, probably a half inch circumference of each link. Q. Did you observe how the defendant was holding the chain? A. He was holding it in his right hand. Q. In

the center? A. No, at one end. Q. Did you observe Mr. Hogan closely as he came out of the kitchen? A. I would say yes sir, I did. Q. Did you observe that one of his hands was bandaged? A. I did not. Q. Did you observe anything unusual in his appearance at all? A. Not unless it would be rage. Q. Did you observe any blood on Hogan's face? A. I did not. Q. Did you observe any blood on the lower part of his body? A. I did not. Q. What was the appearance of Noble as he came through the door? A. There was blood streaming down, not in one stream, but trickles of blood coming down all the way around the hair line, on his face, he was stumbling. Q. What next occurred? A. He was taken right straight on out through the front dining room and out the front door by Mr. Hogan."

Mrs. Gordon, wife of the preceding witness, stated that after Noble went into the kitchen the next she saw or heard was someone calling from the kitchen. Her testimony was much the same as that of her husband as to what she saw after Noble and Hogan came through the door into the dining room. Neither of these witnesses saw any blows struck by Hogan. She saw no blood on Hogan's face, and did not notice any bandage on his hand.

Mr. Isaacson is in the cold storage business in Mount Vernon. This witness did not see Noble go into the kitchen, but he was attracted by an outcry. He turned and looked toward the kitchen, and he could see scuffling going on through the glass panel in the door. Then the door started to open, and the sailor was backing out, shielding his head with his left arm. As the sailor was backing through the door, Hogan struck him over the head with a chain. As the door opened, Isaacson got up from his chair and went over toward the door. He was about eight or nine feet from it as Noble and Hogan came through. This witness stated that he saw Hogan strike Noble at least twice. While he was standing there, Noble's friend came up, and Hogan told him to stand back unless he "wanted some too." This witness stated positively that Hogan did not have a bandage on either hand, and that he observed no blood on Hogan.

Harold Wells, who is in the nursery business in Mount Vernon, was seated at the table with Mr. Isaacson, and was

attracted by someone calling for help. He was in a position to see through the glass panel into the kitchen, and could see motion in there, but nothing definite. About that time, Mr. Isaacson got up and walked toward the door, which obscured the witness's view. The sailor came out of the door backward. Hogan had the chain in his hand, and was right behind Noble, telling him he had better go outside. Noble looked like he had taken quite a beating, and blood was running down his face. This witness did not notice any bandage on either of Hogan's hands, and did not notice any blood on his face. He did not think it was over a minute or two from the time Noble went into the kitchen until he came backing out.

Harlan Warriner heard a commotion in the kitchen and heard someone say, "John, come and help me." Then the sailor was coming through the door backward, and he saw him struck over the head with some object which, from the way it rattled, the witness thought was a chain. He saw Hogan strike Noble twice. Hogan struck as hard as he could, with an overhand swing. The sailor was trying to protect himself as he backed through the door.

"Q. Describe to the jury what you saw, as far as the sailor's actions? A. Do you mean demonstrate? Q. Yes, that is right. A. As he came through the door it seemed to me like the cook was pushing him through with one hand, and the sailor boy had his hands up like this, trying to protect himself, and at the same time backing through the door. After he got through the door the cook struck him again with this chain, and stood with the chain in his hand, and he said something to this effect, 'I can handle you and a thousand like you.' Then he said to get out, and the sailor, this other sailor boy come up, and one of these fellows with the hunting clothes had come up, and the sailor boy turned around and went out and the cook followed him to the door. . . . Q. Did you have a good look at Mr. Hogan? A. I did. Q. Did you see any bandage on either one of his hands? A. No. Q. Did you observe any blood on or about his face? A. No, there was no blood on him."

Dorothy Warriner's testimony was much the same as that of her father. She stated that she saw the cook lift the

chain and strike Noble on the head. She stated that Hogan was in a white uniform, and that she observed no blood on him. She also stated that Noble was offering no resistance, but seemed to be in a dazed condition.

Grace Adams was attracted by the noise in the kitchen, and she looked through the glass panel door and could see the cook slashing with something which, from the rattle, she assumed was a chain. She first saw Noble as he backed through the door into the dining room. While this witness, as stated, saw Hogan slashing down, she could not see Noble until the door opened, and she therefore did not say that she saw Hogan strike Noble. She did not see any blood on Hogan's face, nor did she notice any bandage on his hand.

Mr. Barker did not see Hogan strike Noble.

The resident judge for Skagit county, after the arguments on appellant's motion for judgment notwithstanding the verdict and for a new trial, made the following statement relative to the testimony of appellant, Mrs. McIntosh, and Miss DeMers. He stated that the argument on the motions generally was to the effect that substantial justice had not been done, and that the court, in its sound discretion, should set the verdict aside. He then stated he had concluded that substantial justice had been done. We quote:

"During my many years of practice as a lawyer, and as a judge on the bench, I do not think that I ever before listened to perjury in detail compared to that of the defendant and the lady proprietress and the waitress who claimed to have been in the kitchen at the time of the commencement of the assault. However, the waitress did not go the full way, but claims she was calling on the phone, or had left the room, I do not recall which. However, as I say, I never listened to perjury that was more detailed than was committed by the defendant. I think the jury so understood it, and I think they were right in so understanding it."

We do not commend the act of Noble in picking up his steak in his fingers and going into the kitchen with it, but that act in itself was no justification for appellant's

attacking Noble as he did, according to Noble's statement of what occurred.

The jury were entitled to believe Noble and disbelieve appellant and his witnesses, and, if they believed Noble's story, there was, in our opinion, sufficient evidence of the fact that appellant was the aggressor to warrant the court in giving instruction No. 15.

While there was a conflict in the testimony of the state's witnesses as to what occurred from the time the door to the kitchen opened and they saw appellant and Noble, that very conflict is evidence of the fact that they were endeavoring to tell just what they saw, and not trying to tell some concocted story. We are of the opinion the court did not err in giving instruction No. 15.

■ It is next contended, under assignment of error No. 5, that the court erred in giving instruction No. 17. We cannot consider this assignment, for the reason that instruction No. 17 is not set out in full in appellant's brief. Subdivision 5, Rule of Supreme Court 16, 18 Wn. (2d) 18-2, in effect March 2, 1944, provides:

"Whenever error is assigned upon a ruling or decision on the inclusion, omission, sufficiency, or insufficiency of an instruction or instructions, given or not given, such instruction or instructions, as the case may be, *shall be set out in the brief in full.*" (Italics ours.)

See *State v. Severns,* 19 Wn. (2d) 18, 141 P. (2d) 142. While the cited case was decided in 1943, the rule of this court relative to the necessity of setting out the instruction or instructions in full was then in effect the same as at present. We quote the applicable portion of Rule 16 as it appeared in 193 Wash. 25-a:

"Where an objection is based on an instruction of the court, the instruction shall be set forth in the brief in full."

Appellant failed to set forth in his brief the following portion of instruction No. 17:

"By the law of the state, the assaulting of another is justifiable only when committed in the lawful defense of the person assaulted. When there is reasonable grounds to apprehend a design on the part of the person assaulted

to commit a felony or to do some great personal injury to him and there is evident danger of such design being accomplished."

■ We are satisfied, after an examination of the record, that the jury were properly instructed to consider only second-degree assault; that the evidence would not have justified submitting to the jury assault in the first degree or assault in the third degree.

■ We are further of the opinion that there was substantial evidence introduced by the state to sustain the verdict of the jury. We are also of the opinion that appellant was accorded a fair trial, and that the court was justified in concluding that substantial justice was done.

We find no reversible error in the case, and the judgment entered on the verdict is affirmed.

MALLERY, C. J., BEALS, STEINERT, and ROBINSON, JJ., concur.