[No. 42179.   En Banc.   November 15, 1972.]

THE STATE OF WASHINGTON, *Respondent,* v. LARRY EUGENE ADAMS, *Petitioner.*

*Robert G. Maslan* (of *Maslan & Hanan*), for petitioner (appointed counsel for appeal).

*Christopher T. Bayley, Prosecuting Attorney, John R. Cuningham* and *Fred P. Barnhart, III, Deputies,* for respondent.

HALE, J.—A jury found defendant guilty of assault in the second degree, done with intent to commit rape. The sole claim of error before the Court of Appeals and now this court is directed to the instruction on alibi. The Court of Appeals affirmed. 5 Wn. App. 366, 487 P.2d 218 (1971). We granted review (80 Wn.2d 1002 (1971)), and affirm.

Was it reversible error to give the instruction on alibi, or to instruct on the subject at all? To put the claim of error in appropriate context, we think it necessary to state the salient facts as shown by the record.

About March 14, 1970, P.H., a married woman, was the victim of an assault with intent to commit rape in her home in Northwest Seattle. She identified the defendant, Larry Eugene Adams, an acquaintance of her youngest son, to the police as her attacker. At the time she was alone in the house, her two older children, ages 26 and 23, no longer living with her and her youngest son, age 17, spending the night at a friend's house. Mrs. H's husband was overseas on

a construction job at the time of the crime, a fact which the jury could infer that defendant knew because of his acquaintance with the victim's youngest son.

Mrs. H testified that she had known the defendant for about 4 years; that he was a friend of her youngest son, Jeffrey, and that he had been in their home on several occasions. At times, she said, the defendant came to their house with her son, and he in turn occasionally went to defendant's house. She said that she had told her son that she did not want Larry Adams to be left alone in their house, and once had told her son not to go to the Adams' house because Larry's younger brother had been in trouble. On cross-examination, in discussing her attitude toward the defendant, but at the same time indicating that she had no doubt whatever as to his identity, she testified:

> Well, I tolerated him. I mean I — I — there's — there's a lot of his friends that come to the house. Well, they're kids, you know. They were there. You know they don't bother me. Q. You tolerated him? A. Yes. Q. Would you say that you disliked him? A. Well, I — I — I don't dislike any of his friends. But Larry the day before this happened I was working, and he — he was in the house with Jeff. And I went to work that morning. And when I came home, well, I — I had put steaks out to thaw. And when I came home, they were gone. And I says — I said to Jeff, you know, I said, well, "Where's the steaks?" I thought about them all day. He said, well, "Mom, they're there." So, he goes out to help me find them, and he said, well, "They're gone." I said, "Who was in the house?" He said, "Larry was in the house." I said, "Well, now, you just ask him if he took those steaks." And this is the idea. Larry's been in the house, and there has been things missing. Q. This happened more than once, hasn't it? A. Well, actually this is the first time that actually Larry's been there that I know for sure that something was gone. Q. Haven't you in the past suspected that Larry was stealing things out of your house? A. Well, I — I knew they were gone. But I didn't — I couldn't really pin it on Larry.

She testified that she worked at the post office in the same building but on a different shift and a different floor

from the defendant's. The defendant worked the shift from 2:30 in the afternoon until 11 p.m., whereas she worked the day shift, from 7:45 a.m., until 4:15 p.m. On occasions at work, she observed the defendant on the east loading dock of the post-office building.

Friday, the night of the attack upon her, she had come home very tired from her work at the post office and went to bed early. She was alone in the house. It was early morning when she was awakened by a noise, as she described it, "like a click or something." Thinking her son Jeffrey had returned home, she called his name. She then saw the defendant. She testified:

Q. What did you do? Did you stay in bed, or did you get up? A. No, I, I got up. And I, I thought, well, maybe Jeff had come home, you know. So, I called, you know, "Jeff," you know. And I called, and I get down to the corner, you know the hallway. And I said, "Jeff." And I see, I see — I see Larry down. He is crouched by the window.

She asked the defendant what he was doing there and he told her that Jeff would be coming home soon. The defendant took off his jacket and put it on the davenport in the living room. He walked into the kitchen, opened the refrigerator door, and asked if she had any beer. She told him they had no beer but that she would make him a cup of coffee. While the coffee was perking, she washed some dishes and the defendant sat there talking about his work at the post office. Shortly after she had poured the coffee, and while they were seated in the kitchen, she looked at the clock and said, "Jeff isn't going to be home. . . . You had better leave. I have got to go to work." Up to that time, she was not apprehensive about him.

Her testimony described the following events: She walked to the door to open it for him. Adams got up and followed her and, as she walked toward the door, he grabbed her from behind, put his hand over her mouth, and wrestled her to the floor, holding her nose with his fingertips so that she could not breathe. She struggled with him, and in the course of this scratched his right arm with her

fingernails. When she was about to pass out, she said, he told her that if she wouldn't call the police or tell her son he would let her up.

She said that when he released his grip, her face felt numb, and that it took her a few minutes to start breathing normally again. She tried to run from the house and got the front door open but he intercepted her and shut it. She then realized that her face was bleeding. She ran to the bathroom, saw that her nose and cheek were bleeding, and that her nose and the whole side of her mouth were swollen. The defendant followed her into the bathroom and while she was applying a cold towel to her face, asked her to sit on his lap. He told her she wasn't hurt much, but added, " 'Look at me.' He says, 'I have got a place where you scratched me, too.' " She saw the scratch and later identified the scratch from a police photograph of defendant as the one she said he showed her. She was shaking badly while in the bathroom, she said, and she described how the defendant forced her from it into the bedroom and ordered her to take off her clothes; she described how he disrobed and attempted against her will to have sexual intercourse with her but failed because of his impotence. He left the house, admonishing her, " 'You—be sure that you don't tell Jeff anything about this.' " He left then and she locked the door and heard him drive away at about 7 a.m., in a car that "sounded like my car did once when I didn't have a muffler."

There was substantial corroborating evidence presented to the jury showing defendant's prior acquaintance with Mrs. H's younger son Jeffrey, and with the H family, his employment and working hours at the same post-office facility; there was corroboration as to Mrs. H's physical appearance and emotional demeanor after the assault, and the appearance of a scratch on defendant's arm as described by the victim.

Defendant's evidence consisted chiefly of alibi testimony and a flat denial of guilt. One witness said that the defendant was with him at various places including a restaurant

and bowling alley until about 3:15 a.m. Defendant's father testified that he thought it was about 3:30 when he heard the defendant come home; that he got up and talked hunting and fishing with defendant for about 45 minutes while defendant fixed and ate a sandwich and drank a glass of milk.

Defendant's father said that when he left his son to go back to bed, he looked at his watch and it was 20 minutes after 4. He said he remained awake in bed for 20 to 30 minutes thereafter and did not hear the defendant leave the house during that interval.

On cross-examination, he said that the following day when the police came to the house to arrest the defendant, they told him exactly why they were there. "They told me he was charged with breaking and entering and rape." He acknowledged that he said nothing to the police from which an alibi would be inferred, and did not, he said, at any time tell them that defendant had been home or make any comment to the police whatever to that effect.

As earlier noted, the sole issue on appeal is whether it was reversible error to give instruction No. 11, as follows:

A defense interposed by the defendant in this case is an alibi; that is, that the defendant was at another place at the identical time the crime was committed, if committed at all.

When the state makes out such a case as would sustain a verdict of guilty and the defendant offers evidence, the burden is upon such defendant to make out his defense as to an alibi, but it is not incumbent upon him to prove an alibi beyond a reasonable doubt. When the proof is all in, both that given by the state and for the defendant, then the primary question is, the whole of the evidence being considered, whether such defendant is guilty beyond a reasonable doubt. The law is that if you have a reasonable doubt of the guilt of the accused, after having considered all the evidence, you should acquit; but if, after considering all the evidence, you do not have a reasonable doubt of the guilt of the accused, you should convict.

To ascertain whether this instruction or any instruction pertaining to alibi constitutes reversible error, we should

relate it to the presumption of innocence, proof beyond a reasonable doubt principles, and the instructions as a whole. In considering all of the instructions, we note that instruction No. 1 said that a plea of not guilty put in issue every material allegation of the information. Instruction No. 2 advised the jury that "The defendant is presumed to be innocent unless proved guilty beyond a reasonable doubt," and defined reasonable doubt. Instruction No. 8 reduced the crime charged to its component elements and told the jury, *inter alia,* that to warrant a conviction the state had to prove each element beyond a reasonable doubt. Instruction No. 9 defined the lesser included offense of assault in the third degree and again pointed out that if second-degree assault was not established beyond a reasonable doubt, the offense of third-degree assault had to be shown by proof beyond a reasonable doubt before the jury could find the defendant guilty of that latter offense. Instruction No. 10 told the jury, "If you have a reasonable doubt whether he committed any assault, you will find him not guilty." The trial court thus took good care to make it altogether clear to the jury that suffusing the entire concept of guilt or innocence was the basic standard that the accused was presumed to be innocent, and a verdict of guilty could not be returned unless the jurors were satisfied from the evidence of the defendant's guilt beyond a reasonable doubt. And this theme, it should be noted, is thrice repeated in the challenged alibi instruction given by the court.

Defendant attacks this instruction here as he did in the trial court and the Court of Appeals on the grounds that it places an unconstitutional burden upon him to prove his innocence, and lightens the prosecution's burden of proving guilt beyond reasonable doubt. He said, on this point, that "the instruction . . . placed upon the defendant the unconstitutional burden of making out a defense as to an alibi" in violation of his constitutional rights. The rights claimed to have been violated, he asserts without amplification, are set forth in the fifth and fourteenth amendments

to the Constitution of the United States and in article 1, section 3 of the Constitution of the State of Washington.

We find in this instruction no denial or contravention of such rights. It is a firm and long-established principle in this jurisdiction that an instruction on alibi may be given if supported by the evidence. A reading of *State v. Burton,* 27 Wash. 528, 67 P. 1097 (1902), setting forth such an alibi instruction with approval, makes this proposition clear. The instruction now before us appears to have been taken virtually verbatim from *State v. Rosi,* 120 Wash. 514, 515, 208 P. 15 (1922), where it was explicitly approved despite even a wider challenge than it is subjected to now. In that case, this same instruction was sustained on the basis that, by its very language, it did not remove from the state nor reduce in any degree its burden of establishing each element of the crime beyond a reasonable doubt nor subvert the presumption of innocence.

Again, in *State v. Johnson,* 122 Wash. 394, 210 P. 774 (1922), where the defendant asserted that this very alibi instruction placed an undue burden of proof upon the accused, this court, citing *State v. Rosi, supra,* affirmed the instruction and held it to be without error. The identical instruction to that given in *Rosi* and in the instant case on the subject of alibi was explicitly challenged in *State v. Pistona,* 127 Wash. 171, 219 P. 859 (1923), and set forth in that opinion. In affirming and sustaining it, we said:

> This identical instruction was given in the case of *State v. Rosi,* 120 Wash. 514, 208 Pac. 15, and was there assigned as error. After reviewing the authorities, we held that it properly stated the law to the jury. We have re-examined the authorities and are satisfied with our ruling in that case.

Both the *Rosi* and *Johnson* rulings on the subject of alibi were approved in *State v. Ito,* 129 Wash. 402, 225 P. 63 (1924), and the *Rosi, Johnson* and *Pistona* cases were cited approvingly by this court in *State v. Turpin,* 158 Wash. 103, 290 P. 824 (1930), in support of the proposition that neither the alibi instructions in that case nor the self-defense in-

struction in *Turpin* deprived the accused of the principles of reasonable doubt and presumption of innocence. *Accord, State v. Clayton,* 32 Wn.2d 571, 202 P.2d 922 (1949), referring to an alleged comment on the evidence.

The decisions of our Court of Appeals recognize, too, the long-standing rule of validity given to alibi instructions of this nature. In passing upon the precise instruction at issue and reviewing the theories and authorities brought to bear upon it, that court, in *State v. Pam,* 1 Wn. App. 723, 463 P.2d 200 (1969), concluded that the instruction did not abridge the reasonable doubt and presumption of innocence principles, and did not unconstitutionally shift the burden of proof to the accused. It accordingly sustained the instruction on alibi. *State v. Turner,* 3 Wn. App. 948, 478 P.2d 747 (1970), gave further vindication to an instruction on alibi, setting it forth verbatim. The court noted in that case that certain departures from the language of the *Pistona* instruction rendered it constitutionally impermissible, but affirmed, nevertheless, despite such change because the accused had requested the faulty language. In the instant case, the Court of Appeals (5 Wn. App. 366, 487 P.2d 218 (1971)), cited *Pam* and *State v. Green,* 2 Wn. App. 57, 466 P.2d 193 (1970), with approval to sustain the alibi instruction now in issue.

Accordingly, so long and well established has been this particular alibi instruction that the judges of the superior court have acted well within their discretionary powers in including it in their charge to the jury and have not committed reversible error generally in instructing, where the proof warranted it, upon the subject of alibi nor in giving the particular instruction that was given in this case. We therefore concur with the Court of Appeals that it was not reversible error to give the challenged instruction No. 11.

But that should not be and is not the last word on the subject. Our studies of this precise problem convince us that the matter of alibi instructions ought not terminate simply with an affirmance. The subject warrants an examination of the conceptual aspects of alibi instructions which,

though not found to be reversible error, postulate a query as to whether they should be retained as an integral part of the charge to the jury. Stated otherwise, where the defense of alibi is directly or inferentially raised by the evidence, is it better to give it or omit it? Would the case be tried more fairly without it? Even in those jurisdictions where this type of alibi instruction has long been sustained, there are growing doubts as to its propriety as expressed in majority and dissenting opinions: *State v. Thornton,* 10 S.D. 349, 73 N.W. 196 (1897); *Morris v. State,* 145 Ark. 241, 224 S.W. 724 (1920); *Towns v. State,* 111 Ala. 1, 20 So. 598 (1896); *State v. Ward,* 31 Idaho 419, 173 P. 497 (1918). *And, see State v. Kubicek,* 5 Wn. App. 293, 486 P.2d 1098, *review granted,* 80 Wn.2d 1002 (1971), holding this instruction to be reversible error. These are but examples of a host of cases which, while holding that an alibi instruction does not impair the reasonable doubt and presumption of innocence protections of the constitutions, nor improperly shift the burden of proof from the state to the accused, nevertheless, convey some doubts about the instruction. These cases imply that, although once given, an instruction on alibi does not amount to reversible error but, nevertheless, suggest that the case would be better tried without it. *See* Kinkead's, *Instructions and Entries,* Alibi, p. 33 (1897); Blashfield, *Instructions to Juries,* Instructions as to Defense of Alibi, ch. 28 (1916); Branson, *Instructions to Juries,* ch. 34, § 371 (1914); 3 Richardson, *Florida Jury Instructions,* §§ 3591, 3592 (1954); 5 Reid's Branson, *Instructions to Juries,* § 3373 (Samore repl. 1962 and Cum. Supp. 1971); *Stump v. Bennett,* 398 F.2d 111 (8th Cir. 1968), while not directly in point because of the differences in the instruction at issue, and *Johnson v. Bennett,* 414 F.2d 50 (8th Cir. 1969), note the trend away from the instruction.

An instruction on alibi is, we believe, more often requested by the prosecution than the accused—but there are many instances where the instruction has been requested by the accused and refused. Blashfield, *Instructions to Juries,* Instructions as to Defense of Alibi, ch. 28 (1916).

Recognizing that the courts are in a constant process of improving and examining jury instructions and initiating changes in them for reasons which do not rise to the level of reversible error, we incline toward what we perceive to be the modern view that an instruction on alibi, even though phrased as this one was so as to come within the approved and accepted formula, is better omitted from the charge to the jury. The instructions taken as a whole, without an instruction on alibi, should sufficiently present to the jury a statement of the law on presumption of innocence, burden of proof, reasonable doubt, assessment of credibility and such other instructions as the trial court in its sound discretion believes essential to elucidate the law. Some trial judges in this state, aware of this trend away from the giving of any alibi instruction, in the exercise of their discretion decline to give it when requested by the state, and we think it to be a sound exercise of discretion.

A change in policy with respect to jury instructions does not require a finding of reversible error but insures that degree of flexibility within the judicial system to enable the courts to keep up with the times and to make such changes in jury instructions as will improve the administration of the criminal law. Accordingly, while we find that the particular instruction under challenge here was proper and acceptable in accordance with the law of this jurisdiction, we believe that no instruction on alibi should be given in the future when requested by either the prosecution or the accused. A whole set of sound instructions, we think, adequately covers the law governing the trial without an alibi instruction. The general instructions mentioned earlier gave both parties ample scope to argue to the jury their respective views as to the efficacy of the alibi evidence without risking the introduction of possibly confusing judicial comments on the subject.

Having concluded that instruction No. 11 did not deprive the defendant of any constitutional right nor constitute reversible error otherwise, we affirm. Unless the legislature within its constitutional powers should enact otherwise, in-

structions on alibi should not in the future be included in the charge to the jury whether requested by the accused or the prosecution.

Affirmed.

ROSELLINI, HUNTER, NEILL, STAFFORD, and WRIGHT, JJ., and COCHRAN, J. Pro Tem., concur.

FINLEY, J., concurs in the result.

HAMILTON, C.J. (concurring in part)—I concur in the affirmance, but would authorize the giving of the cited alibi instruction when requested by the accused and the evidence warrants.

Petition for rehearing denied January 12, 1973.