[No. 252-2. Division Two. July 18, 1972.]

THE STATE OF WASHINGTON, *Respondent*, v. ALEXANDER ALEXANDER, *Appellant.*

*Mark G. Honeywell* (of *Gordon, Thomas, Honeywell, Malanca, Peterson, O'Hern & Johnson*), for appellant (appointed counsel for appeal).

*Ronald L. Hendry, Prosecuting Attorney, Joseph D. Mladinov, Special Counsel,* and *Eugene G. Olson, Chief Criminal Deputy,* for respondent.

ARMSTRONG, J.—Alexander Alexander was convicted of second-degree assault on Ronnie Barker during a shootout in front of a Tacoma tavern. Initially he had also been charged with manslaughter in connection with the death of one Mayes on the theory that Alexander had fired upon Barker and in returning his fire Barker had accidentally shot and killed Mayes. Prior to trial it was determined that the bullet that killed Mayes did not come from the guns of either Alexander or Barker. The jury was unaware of both the manslaughter charge and its subsequent dismissal.

Alexander based his not guilty plea upon self-defense. In his appeal from the sentence upon his jury conviction Alexander raises three issues: (1) whether he was entitled to a mistrial because reference to the death of Mayes was in-

jected into the trial; (2) whether the court failed to submit defendant's theory of the case to the jury when it deleted a sentence from the defendant's proposed self-defense instruction, which concluded "to act in self defense one is not bound to wait till the other person has drawn his revolver", and (3) whether the court was in error in rejecting an instruction on the burden of proof of self-defense.

On the night in question Alexander went to South 23rd and K Streets in Tacoma in the hope of resolving a dispute arising out of a prior altercation. A few nights before Alexander had been engaged in a fight in a tavern. Barker, who was serving as a bouncer, hit Alexander with a chair. Alexander cut Barker with a knife or razor. Several individuals had threatened Alexander because of this incident. Alexander stated that he stayed home a few days to avoid trouble and then decided he had to obtain a peaceful settlement.

Arming himself with borrowed .38 and .22 caliber revolvers, which he carried because he feared Barker and knew Barker carried a Magnum, he set forth on his mission to make peace. At the location of the shootout he met Mayes and Jennings, two of the individuals who were involved in the prior argument. All differences were amicably settled with these two men.

When Barker approached the scene defendant's attempts to make peace with him proved unsuccessful. Alexander knew Barker carried a Magnum pistol in a shoulder holster. Mayes was seated in his car and Alexander followed Barker around the car several times trying to talk to him. Barker cursed Alexander and talked about the "cutting" incident. Alexander took his pistol out and waved it about to demonstrate that he too had a gun. This was intended to create a more receptive mood for reaching an agreement on resolving their differences. Barker started across the street. Alexander states that Barker turned around and appeared to reach for his gun in a manner that suggested that he was going to draw it to shoot at Alexander. Alexander responded by firing his gun at the ground near Barker. Subsequently, Barker ran behind his truck and Alexander took

cover behind the Mayes car. A number of shots were exchanged between Barker and Alexander. Unidentified third persons joined the fray. Barker was wounded by a .38 caliber revolver. The source of the bullet that killed Mayes was not identified.

Prior to trial the court ruled upon the admissibility of certain statements made by defendant. At that time the trial court ruled that *statements made to police officers* concerning the death of Mayes would be highly prejudicial since the manslaughter charge regarding Mayes had been dismissed.

The direct examination of one of the state's witnesses, Alonzo Jennings, produced what defendant claims was the first violation of the court's order. Preliminary questioning placed Jennings at the scene of the shootout. The following then occurred:

Q   Did anything unusual or out of the ordinary happen?
A   Yes. My brother-in-law was killed.

In the absence of the jury, defendant's counsel moved for a mistrial. The court reminded defense counsel that the prior admonition referred to the statement of Alexander to the police. The court then admonished the deputy prosecuting attorney that it was up to him to see that *his* witness did not mention the death of Mayes or the trial court would grant a mistrial.

The difficulty of avoiding reference to the death of Mayes is then shown by the fact that on the state's cross-examination of defendant's first witness, in the course of the witness' description of the general occurrence, he stated, "[I]f Ronnie Barker . . . did the same thing that the other guys did, made friends there, everything would have cooled, you know, somebody would have been living today." This was an obvious reference to the death of Mayes. An analysis of the entire statement demonstrates that it was a casual reference in the course of describing the entire event.

The final incident arose when Tacoma Police Department Detective Harold White was asked about his duties on the

night in question and he stated, "I was assigned to the death investigation of Harold Mayes."

At the conclusion of the testimony defendant's counsel again moved for a mistrial. The motion was denied. On appeal he contends that the three references to the death of Mayes constitute prejudicial error and denied him a fair trial. We do not agree.

Prior to the testimony before the jury the trial court made a laudable attempt to limit the testimony of witnesses to avoid reference to the death of Mayes because the court felt that such reference would be prejudicial to the rights of the accused. The problem created by limiting the testimony was that the death of Mayes was an integral part of the shootout between Alexander and Barker—and persons unknown. Witnesses endeavoring to tell the whole truth find it difficult to remember to avoid reference to such an important event in describing a heated and confusing occurrence. Desirable as it may be to delete prejudicial statements, it may be impossible to so sterilize the testimony of witnesses where such testimony is an important and integral part of a tragic and fast-moving sequence of events.

Although the trial court could well consider that evidence regarding the death of Mayes was prejudicial at the beginning of the case, with the benefit of 20-20 hindsight the trial court, and this court, could later determine it was not in fact prejudicial to the defendant's case. At the time of the shootout Mayes was in the car which defendant was using as a shield to avoid Barker's bullets. Mayes was within the range of Barker's fire but not within the range of Alexander's fire. The implication from the testimony could well be that Barker shot and killed Mayes. The jury could also have considered, as did the witness Jennings, that if Barker had made friends as the other men did Mayes would still be living. In some respects the testimony about Mayes' death was favorable to the defendant. Considering all of that evidence, we do not find prejudicial error in this respect.

Defendant next contends the trial court denied him the opportunity of arguing his theory of the case by the deletion of the last sentence of defendant's proposed instruction on self-defense. After deleting the italicized last sentence the defendant's proposed instruction was given as the court's instruction No. 12.[1] The disputed proposed instruction in question provides as follows:

A person who has been attacked and who is exercising his right of lawful self-defense is not required to retreat, and he not only may stand his ground and defend himself against the attack but may also pursue his assailant until he has secured himself from danger if that course appears to him, and would appear to a reasonable person in the same situation, to be reasonably and apparently necessary; and this is his right even though he might more easily have gained safety by withdrawing from the scene. *In this same regard you are instructed that to act in self-defense one is not bound to wait till the other person has drawn his revolver.*

(Italics ours.)

In striking the italicized material the trial court stated that it was a comment upon the evidence. It was well within the trial court's discretion to so conclude.

The defendant's answer is that the stricken language is basically contained in *State v. Adamo*, 128 Wash. 419, 426, 223 P. 9 (1924). In that case instruction No. 14 told the jury that to justify killing in self-defense, there need be no actual danger, "but there must be . . . some overt act . . ." Instruction No. 17 advised the jury that "although it is not necessary that you find any overt act was actually committed by the deceased" yet "bare fear" alone will not

---

[1]In addition to the court's instruction No. 12 the court also instructed the jury on self-defense in instruction No. 11:

It is lawful for a person who is being assaulted, and who has reasonable ground for believing that bodily injury is about to be inflicted upon him, to stand his ground and defend himself from such attack, and in doing so he may use all force and means which he believes to be reasonably necessary and which would appear to a reasonable person, in the same or similar circumstances, to be necessary to prevent the injury which appears to be imminent.

be a justification unless there was reasonable grounds for the fear. The *Adamo* court then stated:

> The first instruction does not state that to justify the killing there must have been some actual overt act, but that either there must have been such overt act or a reasonable anticipation that one would immediately follow. *This is correct because one, to act in self-defense, is not bound to wait till the other has drawn.* Number 17 carries out the idea of number 14 by saying that no overt act need have been "actually committed." We have no doubt these instructions correctly stated the law.

(Italics ours.)

■ It is obvious that the *Adamo* court was merely explaining its ruling on the instructions it was approving. The law is well established that the fact that certain language is used in an appellate court decision does not mean that it can be properly incorporated into a jury instruction. *Turner v. Tacoma*, 72 Wn.2d 1029, 435 P.2d 927 (1967). It is equally well established that instructions should not be so factually detailed as to emphasize certain aspects of a party's case and thus point up or buttress his argument to the jury, but rather should be limited to enunciating basic and essential elements of the legal rules necessary to enable the parties to each present their theories of the case. The parties are thus able to argue the basic rules within the factual framework of the case. *Laudermilk v. Carpenter*, 78 Wn.2d 92, 457 P.2d 1004, 469 P.2d 547 (1969). Detailed factual instructions such as the stricken sentence in the instant case, although once frequently given by trial courts, are now deemed to be instructions which point up, underline, or buttress portions of counsel's argument.

■ Additionally we feel that defendant too narrowly construes the wording in instruction No. 12, particularly the wording "a person who has been attacked." In its common usage attack is not limited in its meaning to an actual physical accosting, but may be used to describe an offensive or antagonistic action of any kind. Such a construction would have clearly presented defendant's theory of the case.

■ While each party is entitled to have his theory of the case set forth in the court's instructions, the trial court has considerable discretion in how the instructions are worded. If the instructions are readily understood and not misleading to the ordinary mind they are sufficient. The test of the sufficiency of instructions given on the theory of the case has been held to be whether, from the instructions given, counsel may satisfactorily argue his theory of the case to the jury. *State v. Dana,* 73 Wn.2d 533, 439 P.2d 403 (1968).

In the instant case there was substantial evidence that Barker had verbally threatened the defendant. It could be argued that Barker turned his back on defendant and when he was about 10 feet away Barker put his hand to the area where he kept his gun and turned around as if to draw his gun and shoot defendant. The jury could have found from the court's instructions and argument of counsel that this menacing gesture was an attack. Conversely they could believe that since the defendant had his gun in hand as Barker started walking away that Barker felt menaced and in need of protecting himself.

Lastly, defendant assigns error to the trial court's refusal to give a requested instruction which he contends properly sets forth the burden of proof required to establish the defense of self-defense.

The instruction submitted by defendant and refused by the trial court was as follows:

You are instructed that a factor which must be taken into consideration in determining whether or not a particular act amounts to an assault, for which the actor may be held criminally liable, is the element of justifiable cause, for if the evidence shows that the act committed was justifiable, or leaves that question in doubt, then the criminal act has not been proved.

■ We believe the language in the above proposed instruction fails to adequately clarify the burden of proof required to establish the defense of self-defense and that the court properly refused it. The instruction refers to justifiable cause and fails to specifically focus upon the defense

of self-defense. As drafted, a jury could easily find the above instruction confusing.

In support of his proposed instruction regarding defendant's burden of proof, counsel on appeal calls our attention to the case of *State v. Turpin*, 158 Wash. 103, 110, 290 P. 824 (1930) wherein the court approved the following portion of a self-defense instruction in a homicide case:

> When a defendant claims that he killed another in self-defense of his own person, the burden is upon the defendant to prove that the homicide was done in self-defense. It is not necessary for the defendant to prove this to you beyond a reasonable doubt, nor by a preponderance of the evidence. The defendant sustains this burden of proof if from a consideration of all the evidence in the case you have a reasonable doubt as to whether the killing was done in self-defense.

(Italics omitted.)

We believe the above instruction represents a clear, accurate and complete statement of the law as to a defendant's burden of proof regarding the defense of self-defense. Had defendant proposed an instruction setting forth the burden of proof with the same detail and clarity as enunciated in *State v. Turpin, supra,* it would have been error to refuse it.[2] Such was not the case, however. No instruction based on *State v. Turpin, supra,* was prepared and given to the court. The proposed instruction which was offered to the court was not substantially correct nor could the court have given it without modification and clarification. Under such circumstances the court need not give the proposed instruction.

Judgment affirmed.

Petrie, C.J., and Pearson, J., concur.

Petition for rehearing denied August 22, 1972.

---

[2]Counsel on appeal did not represent defendant in the trial court. In defense of trial counsel's failure to propose an instruction based upon *State v. Turpin*, 158 Wash. 103, 290 P. 824 (1930), it should be pointed out that the instruction has rarely been proposed by defense counsel or given by the trial courts.