IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 86840-3-I |
| Respondent, | |
| v. | DIVISION ONE |
| AIDEN FETTERS, | UNPUBLISHED OPINION |
| Appellant. | |

DÍAZ, J. — A jury convicted Aiden Fetters of burglary for entering a home to a commit a crime, when making a delivery for United Parcel Service (UPS). He argues that the court improperly permitted law enforcement to express opinions about his guilt, that his counsel was ineffective in multiple ways, and that the court gave a jury instruction in violation of his constitutional rights and abused its discretion when it admitted evidence of Fetters' earlier similar entry into another house. We affirm.

## I.    FACTS

In July 2022, Fetters, a UPS driver, arrived at the front door of the Califf family's home to deliver a package. As captured on a home security video played at trial, Fetters first knocked on the front door and announced himself as UPS multiple times. After receiving no answer, he walked around to the back of the house, peered through a glass doorway, opened it, and entered the back of the house. He looked around briefly, went

back outside, and entered the house through the front door.

Once inside, the Califfs' security camera footage further showed that Fetters announced himself again and walked slowly and deliberately through the house. He then picked up a purse but took nothing from it; the wallet was not in the purse at the time.

Fetters then continued down the hallway where he encountered the Califfs' 15-year-old daughter, E.C. In a later-recorded interview also played at trial, he told the arresting officer Sgt. Garique Clifford that he informed E.C. that he entered the home because he needed a signature for the package and asked her if everything was okay, noting the door was open. After a brief exchange, he left without getting a signature.

Fetters testified at trial that he entered the Califf home because he saw that the front door was ajar and that there were no lights visibly on after dark, so he was concerned and wanted to make sure the residents were okay. He variously described the front door as "ajar" or "unlatched." Finally, he testified that he handed the package to the Califf's teenage daughter once he met her inside, and that she thanked him and he left without taking anything from the house.

The jury convicted Fetters of residential burglary, as charged. A superior court sentenced him a month later, in March 2023, and he timely appealed.

## II.     ANALYSIS

### A.     Opinions About Fetters' Guilt

Fetters argues that the trial court erred when it allowed the jury to hear evidence or testimony in which he alleges Sgt. Clifford improperly opined that Fetters was not being truthful or was guilty of burglary. It is generally improper for any witness to express a personal opinion on a defendant's guilt. State v. Garrison, 71 Wn.2d 312, 315, 427 P.2d

1012 (1967).

As Fetters concedes, however, he did not object to any of the allegedly improper statements of opinion at trial. He asks this court, nonetheless, to review this assignment of error under RAP 2.5(a)(3), claiming the admission of these statements constitute manifest constitutional error. This court has recognized that opinions on ultimate issues may violate a defendant's constitutional right to a fair and impartial jury trial. State v. Dolan, 118 Wn. App. 323, 329, 73 P.3d 1011 (2003).

However, when such an alleged statement is not objected to at trial, as here, the admission of such evidence "is not automatically reviewable as a 'manifest' constitutional error. 'Manifest error' requires a nearly explicit statement by the witness that the witness believed the accusing victim," or "an explicit or almost explicit witness statement" on an ultimate issue of fact or expressing a personal opinion on the defendant's guilt. State v. Kirkman, 159 Wn.2d 918, 936-37, 155 P.3d 125 (2007) (citation omitted); see also State v. Smiley, 195 Wn. App. 185, 190, 379 P.3d 149 (2016) (holding that "[t]estimony that is not a direct comment on the defendant's guilt or on the veracity of a witness, is otherwise helpful to the jury, and is based on inferences from the evidence, is not improper opinion testimony").

Following Fetters' organization, the allegedly improper statements may be grouped in two sets. The first set concerns Sgt. Clifford's comments while he interrogated Fetters, and the second set concerns statements the sergeant made during trial. We address each in turn.

1. Sgt. Clifford's Interrogation

The State played the body-cam footage of Sgt. Clifford's interrogation. Sgt. Clifford

is heard telling Fetters that his version of events "doesn't make sense," encouraging Fetters to "be square" with him, and urging Fetters to tell him "the honest truth." Sgt. Clifford also is heard telling Fetters that his explanation sounded "weird to [Sgt. Clifford]" and "seem[ed] kind of odd."

Sgt. Clifford's commentary certainly expressed skepticism about Fetters' account, and, as a matter of best practice, the parties could have redacted these statements from the interrogation. His statements, however, were not, on their face, individually or together, "an explicit or almost explicit" statement on "an ultimate issue of fact" or represented Sgt. Clifford's "personal opinion on [Fetters'] guilt." Kirkman, 159 Wn.2d at 936-37. Instead, as in Smiley, Sgt. Clifford is essentially telling Fetters "'to tell [him] the truth.'" 195 Wn. App. at 190. And, also as in Smiley, rather than "stating a personal opinion about [Fetters'] veracity," Sgt. Clifford's comments were "'tactical interrogation statements designed to challenge the defendant's initial story and elicit responses that are capable of being refuted or corroborated by other evidence or accounts of the event discussed.' It gave the defendant the opportunity to explain why his account of what happened made sense despite its seeming inconsistency with other evidence." 195 Wn. App. at 190 (citation omitted) (quoting State v. Notaro, 161 Wn. App. 654, 669-70, 255 P.3d 774 (2011)); see also State v. Demery, 144 Wn.2d 753, 763, 30 P.3d 1278 (2001) (plurality opinion) (where a plurality of our Supreme Court held that "juries understand that the police typically do not believe the defendant's story" and that, therefore, they are unlikely to "attach any special significance to this fact," or to give an officer's statements in a pretrial interview disproportionate weight because "an officer's statement made during a taped interview is essentially different from a prosecutor's statement made during

trial" (emphasis omitted) (citing <u>Dubria v. Smith</u>, 224 F.3d 995, 1002 (9th Cir. 2000)); <u>United States v. Espinosa</u>, 827 F.2d 604, 613 (9th Cir. 1987)); <u>Koenig v. Pierce County</u>, 151 Wn. App. 221, 231, 211 P.3d 423 (2009) (recognizing that "[a] plurality opinion is often regarded as highly persuasive, even if not fully binding").

Therefore, these statements were "not an impermissible opinion regarding [Fetters'] veracity," let alone explicit or nearly explicit statements of guilt. <u>Smiley</u>, 195 Wn. App. at 190; <u>Kirkman</u>, 159 Wn.2d at 937.

Fetters also contends that Sgt. Clifford conveyed his explicit opinion of his guilt during the interview by telling him what he was being arrested for. Specifically, Fetters argues that by "*explicitly*" telling Fetters what he was being arrested for, he "made an *explicit* statement that he held these personal beliefs: Fetters you're a burglar; You're a thief; You're a liar. It doesn't get more explicit than this." In fact, Sgt. Clifford stated, "Okay. So right now you're under arrest for burglary and attempted theft, okay?"

We conclude that the words Sgt. Clifford actually uttered are not a "nearly explicit" statement of Clifford's opinion that Fetters was guilty, but only, at most, that he had probable cause to arrest him, was effectuating the arrest, and confirmation that Fetters understood that action. Fetters' *characterization* of those statements would be examples of such explicit statements, but Sgt. Clifford did not make such statements. In turn, none of Sgt. Clifford's pretrial interview statements constitute manifest constitutional error. <u>Kirkman</u>, 159 Wn.2d at 936.

2. <u>Sgt. Clifford's Trial Testimony</u>

Fetters next claims that the State manifestly violated his constitutional rights when it elicited Sgt. Clifford's testimony that Fetters' conduct of walking around the Califfs' home

did not appear to him to be a "welfare check," were not "above board," and appeared to be "casing" behavior, based upon the sergeant's law enforcement experience. Fetters claims each statement constitutes an improper opinion on his veracity or guilt. We disagree because he takes each statement out of context and, ultimately, none are explicit statements of either veracity or guilt.

As to Sgt. Clifford's statement that "what happened here" did not "appear to be like a . . . kind of welfare check," Fetters ignores his own theory of the case, namely—as his counsel stated in his opening statement—that when he arrived at the Califfs' home "[h]e thought it was odd" that the front door was ajar, that he was concerned, that "[s]omething didn't feel right." And that he entered and exited the house "like someone concerned for safety in an unusual situation."

Fetters further ignores that the State asked Sgt. Clifford, first, whether as an officer he did "welfare checks" and asked him to describe how they typically commence and conclude. The sergeant testified that he had conducted hundreds or even thousands of such checks, that they begin with a neighbor, family member, or friend asking law enforcement to check on someone they have not heard from to see if they need help, and that they conclude "in every case . . . in contact with the homeowner." He was then asked factually if his understanding of Fetters' behavior was "that kind of welfare check," so defined. He said no and described what he saw on the video that distinguished a law enforcement officer's welfare check from Fetters.

Sgt. Clifford's use of the term "above board" also occurred (twice) in the context of how he conducts welfare checks. In addition to being in contact with the homeowner, Sgt. Clifford testified that he ensures "everything's above board," by which he meant

officers "make sure that the homeowner knows that we've been in their house. If they're not home for some reason, I'll leave a card. I'll leave a message on their phone."

These statements do not explicitly or nearly explicitly convey the belief that Fetters was guilty of burglary or was lying when describing his own subjective intent. Kirkman, 159 Wn.2d at 936. Instead, the State elicited both statements to factually contrast Fetters' behavior from law enforcement's actions, when they are both concerned—as Fetters' counsel described it—about a resident's safety.

As to Sgt. Clifford's statement that Fetters' conduct was "the sort of thing" that could "raise any red flags" of "casing type behavior," Fetters ignores that that statement followed Sgt. Clifford's explanation of what "casing behavior" is. Sgt. Clifford explained that persons who commit burglary or car prowls will visit a neighborhood or construction sites, multiple times "looking for an opportunity to commit crimes, generally, property crimes of theft and whatnot." He further explained that law enforcement, in that context, would "make contact with [the suspect] to see what they're up to."

It was in that context that Sgt. Clifford testified that, unlike most delivery drivers, persons who are "casing" a neighborhood or house do look in people's window or "go around the back or side" of the house, as Fetters did. As in the "welfare check" testimony, the State elicited this factual comparison of Fetters' behavior to unlawful actions that would prompt a law enforcement response, in response to the claim that—as Fetters' counsel described it—he was concerned about a resident's safety.

Regardless, this final statement also did not explicitly or nearly explicitly opine that he believed the actions Fetters was taking made him guilty of the later burglary or meant he was lying when describing his own subjective intent for going through the back door.

7

Kirkman, 159 Wn.2d at 936. At most, Sgt. Clifford commented that Fetters' initial actions—again looking through the window or going around the back—would have potentially prompted initial law enforcement involvement. This statement is far from a direct statement that reaches a manifest constitutional error. Smiley, 195 Wn. App. at 190; Kirkman, 159 Wn.2d at 936; cf. State v. Barr, 123 Wn. App. 373, 382, 98 P.3d 518 (2004) (holding it was manifest error for law enforcement to make "observations of [the defendant's] behavior indicating that there were signs" he was not being truthful or that "it was obvious . . . he was afraid he was going to go to prison for this"); State v. Johnson, 152 Wn. App. 924, 933, 934, 219 P.3d 958 (2009) (holding it was improper for a witness to testify "oh my god, [the victim's accusations are] true").

What is more, the jury was properly instructed that they were the sole judges of the credibility of each witness and of the value or weight to be given to each witness' testimony. Our Supreme Court in Kirkman held that such instructions weigh against finding actual prejudice because "[j]urors are presumed to follow the court's instructions." 159 Wn.2d at 937, 935 (further holding that "'[e]ssential to this determination is a plausible showing by the defendant that the asserted error had practical and identifiable consequences in the trial of the case'" (internal quotation marks omitted) (quoting State v. WWJ Corp., 138 Wn.2d 595, 603, 980 P.2d 1257 (1999))). This deference reflects the trust we afford the jury's abilities and the respect we have for its constitutional role. Id. at 938.

Therefore, Fetters' first four assignments of error fail.

B.    Ineffective Assistance of Counsel

1.    For Failing to Object

Fetters next contends that, even if Sgt. Clifford's statements were not explicit or nearly explicit opinions on his veracity or guilt, "[t]here can be no doubt" that the court would have sustained objections alleging they were improper opinion. He then argues, had his counsel made such objections, that there is a reasonable probability the jury would not have convicted him and that, therefore, it was constitutionally ineffective not to object. We disagree.

To make an ineffective assistance of counsel claim, a defendant must make two showings: (1) that their counsel's representation was deficient, and (2) that the deficient representation prejudiced the defendant. State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). This court applies a strong presumption that counsel's representation was effective. Id. at 335. To prove deficiency, a defendant must show that the representation "fell below an objective standard of reasonableness based on consideration of all the circumstances." Id. To prove prejudice, a defendant must show there is a reasonable probability that, without counsel's errors, the result of the proceeding would have been different. Id.

"If a defendant centers their claim of ineffective assistance of counsel on their attorney's failure to object, then 'the defendant must show that the objection would *likely* have succeeded[,]'" to show deficient performance. State v. Vazquez, 198 Wn.2d 239, 248, 494 P.3d 424 (2021) (emphasis added) (quoting State v. Crow, 8 Wn. App. 2d 480, 508, 438 P.3d 541 (2019)). "Only in egregious circumstances, on testimony central to the State's case, will the failure to object constitute incompetence of counsel justifying reversal." Id. However, "if defense counsel fails to object to inadmissible evidence, then they have performed deficiently, and reversal is required if the defendant can show the

9

result would likely have been different without the inadmissible evidence." Id. (quoting Crow, 8 Wn. App. 2d at 508-09). "Because claims of ineffective assistance of counsel present mixed questions of law and fact, we review them de novo." In re Pers. Restraint of Brett, 142 Wn.2d 868, 873, 16 P.3d 601 (2001).

Our Supreme Court in Kirkman instructs us to consider "the circumstances of the case," including the following five factors to guide whether the statements were inadmissible opinion testimony and, thus, the failure to object deficient: "(1) 'the type of witness involved', (2) 'the specific nature of the testimony', (3) 'the nature of the charges', (4) 'the type of defense, and' (5) 'the other evidence before the trier of fact'." 159 Wn.2d at 928 (quoting Demery, 144 Wn. 2d at 759). Fetters addresses only the first and third factors without any substantive analysis. Nonetheless, we consider each factor as needed to each type of statement challenged.

As to the statements Sgt. Clifford made during his interrogation of Fetters, the nature of the testimony weighs heavily in favor of admissibility. As explained above, Sgt. Clifford's statements were tactical interview questions rather than statements of his personal beliefs, and this court has recognized a jury is less likely to be improperly swayed by an officer's statements in a pretrial interview than by statements in trial testimony. Notaro, 161 Wn. App. at 669; Demery, 144 Wn.2d at 763. Thus, the court was not "likely" to have sustained the objection to those statements of skepticism and, even if some court may have sustained the objection, Fetters does not establish that it matters.

As to Sgt. Clifford's trial testimony, we hold that only the first factor weighs in favor of a court "likely" deeming the statements improper opinion testimony, but the remaining factors lean against such a likelihood.

10

As to the first factor (type of witness), under <u>Notaro</u> and <u>Demery</u>, there is a risk that a law enforcement officer carries greater weight with a jury than a civilian witness. <u>Id.</u>

As to the second factor (nature of the testimony), as discussed above, Sgt. Clifford's statements regarding welfare checks and casing behavior were factual comparisons and contrasts, rather than statements of Fetters' truthfulness or guilt. <u>Cf.</u> <u>State v. Saunders</u>, 120 Wn. App. 800, 812-13, 86 P.3d 232 (2004) (holding it was improper for a detective to state that the defendant's responses "weren't always truthful"); <u>State v. McBride</u>, 192 Wn. App. 859, 873, 370 P.3d 982 (2016) (holding, in the unpublished portion, that it was improper for law enforcement to testify that the State's key witness had given him "truthful information").[1]

As to the third and fourth factors (the nature of the charges and defense), Sgt. Clifford's statements regarding welfare checks and casing behavior were not elements of the charge of burglary, but, as explained above, directly responsive to Fetters' primary defense, namely, that he did not intend to enter the Califfs' home to commit a crime but because he was concerned for their safety.

As to the fifth factor (the other evidence before the trier of fact), as will be discussed below, the State had numerous pieces of evidence to suggest Fetters' culpability other than Sgt. Clifford's statements.

In short, Fetters does not establish that his counsel likely would have succeeded because the statements were not clearly impermissible opinion. Stated otherwise, these

---

[1] We cite to the unpublished portion of this opinion because it is necessary to reasoned opinion, as it was cited in Fetters' brief.

factors demonstrate that, under <u>Vazquez</u>, Sgt. Clifford's statements were neither "egregious" nor "central to" the State's case. 198 Wn.2d at 248.

Moreover, even if Fetters had shown these statements constituted impermissible opinion testimony, he has not shown prejudice, i.e., that there is a reasonable probability that, had his counsel objected, the result of his trial would have been different.

There was ample other evidence before the jury to establish Fetters' guilt, even casting aside Sgt. Clifford's testimony. Video evidence established that Fetters entered through the back door and touched Ms. Califf's purse. He told Sgt. Clifford that he did not remember going through the back door and gave no explanation for these inculpatory actions. Fetters also told Sgt. Clifford he "d[id]n't know why" he picked the purse up, and repeated the same at trial.

Contrary to a key reason he claimed he entered the house, E.C. testified, and Fetters admitted at trial, that he did not ask for signature when he interacted with her inside the house. Fetters further acknowledged that he did not need a signature because of, he claimed, COVID-related delivery policies. The jury also heard from UPS management and security, who testified that the package did not require a signature. UPS employees further testified that an item at a price as low as the package Fetters was delivering would never require a signature, and that UPS drivers never need to enter homes when making a delivery.

Based on this evidence, there is not a reasonable probability that the jury would have acquitted Fetters had his counsel objected, even assuming Sgt. Clifford's statements did improperly express his opinion about Fetters' veracity or guilt.

2.      <u>For Failing to Assert the Privilege of, and Propose an Instruction relating to, Private Necessity</u>

Fetters next claims his counsel was ineffective because he did not argue Fetters had a privilege to enter the Califfs' home and did not propose a jury instruction explaining his entry was privileged. Specifically, Fetters asserts that his trial counsel "did not know" that, according to the common law of torts, an uninvited entry is "privileged" and thus not unlawful, if the entry was to aid an injured or endangered person inside. Because counsel did not know this legal maxim, allegedly, was the law in Washington, he never contested Fetters' "unlawful entry" or proposed a privilege instruction, acting deficiently. We disagree.

Fetters cites no Washington law that applies this common law privilege, and the only out-of-state cases he cites for the privilege concern the actions of police officers. (Citing People v. Roberts, 47 Cal.2d 374, 303 P.2d 721 (1956)); (citing People v. Ray, 21 Cal.4th 464, 468, 981 P.2d 928 (1999)); (citing State v. Bridewell, 306 Or. 231, 253, 759 P.2d 1054 (1988) (Petersen, C.J., concurring and dissenting)). Indeed, Fetters concedes, "no Washington court has considered this particular privilege to enter a home," and further conceded at oral argument that he is not aware of any Washington court that has ever applied the common law privilege of private necessity to criminal conduct similar to the charges here. Wash Ct. of Appeals oral argument, State of Washington v. Aiden Fetters, No. 86840-3-I (November 6, 2024), at 1 min., 45 sec. through 1 min., 56 sec. video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2024111124/?eventID=2024111124. Instead, Fetters relies on a case which does not actually cite to that common law privilege, and whose holding addressed a child's privilege to enter their own parents' home, which is clearly inapposite. (Citing State v. Steinbach, 101 Wn.2d 460, 462, 679 P.2d 369

13

(1984)). Effectively, therefore, his request is that this court apply the common law privilege in this type of case for the first time. We decline the invitation to do so.[2]

Finally, this court has repeatedly held that the failure to raise a novel legal theory does not constitute deficient performance. State v. Sanchez, 29 Wn. App. 2d 382, 390, 546 P.3d 436 (2024), review denied, 3 Wn.3d 1007, 551 P.3d 438 (2024).

Therefore, Fetters sixth assignment of error fails.

C.     Jury instruction on the Permissive Inference of Criminal Intent

Fetters argues that the trial court violated his constitutional rights when it gave jury instruction 11, which informed the jurors that they may infer intent to commit a crime inside the residence solely from Fetters' unlawful entry or presence in the house. Specifically, and consistent with RCW 9A.52.040, instruction 11 reads:

> A person who enters or remains unlawfully in a building may be inferred to have acted with the intent to commit a crime against a person or property therein. This inference is not binding upon you, and it is for you to determine what weight, if any, such inference is to be given.

He claims this instruction violated his due process rights and his right to a trial by jury because the instruction constitutes a comment by the court on the evidence. We address each in turn.

1.     Due Process

Relying on State v. Cantu, 156 Wn.2d 819, 826, 132 P.3d 725 (2006), and State v. Brunson, 128 Wn.2d 98, 107, 905 P.2d 346 (1995), Fetters rightly states that, "when

---

[2] Moreover, at oral argument, Fetters acknowledged he would have exceeded the scope of such a privilege to enter if the jury found his actions demonstrated a criminal intent to *remain* unlawfully, and he conceded there was sufficient evidence for such a finding in the State's case, e.g., from the fact that he did not explain touching Ms. Clifford's purse. Wash. Ct. of Appeals oral argument, supra at 2 min., 27 sec. through 4 min., 16 sec.

14

permissive inferences are only part of the State's proof supporting an element and not the 'sole and sufficient' proof of such element, due process is not offended if the prosecution shows that the inference more likely than not flows from the proven fact." He argues that instruction 11 was unconstitutional because, "given the circumstances of the defendant's entry," the predicate facts underlying his "unlawful entry" did not make it more likely than not that Fetters entered with intent to commit a crime. We disagree with this characterization of the evidence, as it is incomplete. The State did not establish mere unlawful entry.

As reviewed above, the home surveillance video showed Fetters entering the front door only after going to the rear of the house, peering inside, entering, and leaving. The video also showed him moving slowly through the house and picking up Ms. Califf's purse. As also reviewed above, Sgt. Clifford's testimony indicated such conduct correlates with a person investigating an opportunity to commit a property crime. In short, the State presented evidence to permit a jury to infer, from these proven facts, that Fetters possessed a criminal intent.

In response, Fetters argues that, even if there was some evidence in support of the State's case, his due process rights were violated because the evidence of his intent was not a matter of "logical probability" but "patently equivocal." (Citing State v. Bergeron, 105 Wn.2d 1, 20, 711 P.2d 1000 (1985)). Fetters contends that the only evidence proven and before the jury was that a delivery person with a package to deliver—in a rural neighborhood, where police could not arrive quickly—saw an open door and entered it around 9:30 p.m. after announcing himself as a UPS driver. In support, Fetters primarily relies on State v. Woods, 63 Wn. App. 588, 590, 821 P.2d 1235 (1991), and State v.

Jackson, 112 Wn.2d 867, 774 P.2d 1211 (1989). Both are distinguishable.

In Woods, the State charged two boys with burglary after one of the boys had kicked in the door to his mother's house. 63 Wn. App. at 590. This court held there was insufficient proof the boys intended to commit a crime inside, noting that, not only was nothing taken, but that one of the boys testified that they entered so his friend could retrieve his jacket because it was raining outside, and that the boys' flight could equally mean that they were afraid of the mother's anger at the damage to the door or that they intended to commit a crime. Id. at 591-92. These facts were undisputed and, thus, the evidence of intent was equivocal. Id.

In Jackson, the State had only pled and proven attempted burglary and had shown that the defendant threw a rock through a window and had admitted in a statement that he had intended to enter. 112 Wn.2d at 876. Our Supreme Court held that, to infer criminal intent in a burglary case, "there must be evidence of entering or remaining unlawfully in a building," such that the instruction could not be given if there is no evidence which placed the defendant inside a building. Id. The Court concluded that the inference was improperly given, not only because two different interpretations could follow from the evidence, but also because two distinct crimes could have as well. Id.

In contrast to Woods, there was no evidence that Fetters had the even arguable right to enter the Califfs' home, no explanation of why he entered through the back door, and no explanation why he touched Ms. Califf's purse once he entered. In contrast to Jackson, it is undisputed that Fetters entered the Califfs' home and Fetters does not claim the evidence equally suggested more than one possible crime. In contrast to both cases, the jury could have inferred criminal intent either from the facts surrounding his various

16

entries into, or hia conduct while remaining in, the home, including his slowly walking around the house and, again, picking up Ms. Califf's purse.

In short, the State presented sufficient evidence, under <u>Bergeron</u>, that his entry into the home was, as a matter of "logical probability," for the purpose of committing a crime and, thus, did not violate his right to due process. 105 Wn.2d at 20.

2.    <u>Unconstitutional Comment on the Evidence</u>

We held in <u>State v. Alexander</u>, 7 Wn. App. 329, 335, 499 P.2d 263 (1972), that "instructions should not be so *factually detailed* as to emphasize certain aspects of a party's case and thus point up or buttress his argument to the jury." (Emphasis added.) Fetters asserts that instruction 11 unconstitutionally commented on the evidence because it highlighted the inference of intent as a particular permissible inference, among all other possible inferences the jury was generally permitted to draw from circumstantial evidence. We disagree.

<u>Alexander</u> is inapposite. There, this court considered an instruction that was so factually detailed that it would risk skewing a jury's understanding of a case. 7 Wn. App. at 335. Here, the instruction contained no factual details of the case. Rather, it simply reflected the language of a statute which specifically allows a jury to infer intent element in any burglary case. RCW 9A.52.040.

It is certainty correct that a trial court's "remark that has the potential effect of suggesting that the jury need not consider an element of an offense could qualify as judicial comment." <u>State v. Levy</u>, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006). But, instruction 11 contained only permissive language reflecting the inference that is authorized by RCW 9A.52.040.

We thus reject Fetters' argument that instruction 11 unconstitutionally commented on the evidence.[3]

D.     ER 404(b) and Common Scheme or Plan

ER 404(b) prohibits admitting evidence "of other crimes, wrongs, or acts" to prove a defendant has a criminal propensity.  Such evidence "may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  State v. DeVincentis, 150 Wn.2d 11, 17, 74 P.3d 119 (2003) (quoting ER 404(b)).

A court may admit other prior acts to show a "common scheme or plan" where the prior acts provide "evidence of a single plan used repeatedly to commit separate but very similar crimes."  Id. at 19 (citing State v. Lough, 125 Wn.2d 847, 856, 889 P.2d 487 (1995)).  The prior acts and charged crimes must be "markedly similar acts of misconduct against similar victims under similar circumstances"—circumstances which "are naturally to be explained as caused by a general plan of which they are the individual manifestations."  Lough, 125 Wn.2d at 856.  Such evidence may be "offered to show that the defendant has developed a plan and has again put that particular plan into action."  State v. Gresham, 173 Wn.2d 405, 422, 269 P.3d 207 (2012).  "Factors relevant to similarity include geographical proximity and commission of the crimes within a short time frame."  State v. Vy Thang, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002).[4]

---

[3] We need not reach Fetters related argument that, if we agree instruction 11 was given in error, there is insufficient evidence to support his conviction.

[4] For evidence of prior misconduct to be admissible under ER 404(b), "the trial court must (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect."  Thang, 145 Wn.2d at 642.  Fetters addresses none

"A trial court's decision to admit evidence of prior bad acts is reviewed for abuse of discretion." State v. Denham, 197 Wn.2d 759, 771, 489 P.3d 1138 (2021). "Discretion is abused when the trial court's decision is manifestly unreasonable, or is exercised on untenable grounds, or for untenable reasons." State v. Blackwell, 120 Wn.2d 822, 830, 845 P.2d 1017 (1993).

Fetters argues that the trial court erred by admitting, under Rule 404(b)'s common scheme or plan exception, evidence of Fetters' prior conduct. The court permitted residents of another house to testify that, in delivering a package earlier the same day, he engaged in behavior similar to that at the Califfs'; namely, that he went around to the back door rather than the front door and that he claimed to need a signature for a package that did not require one. They also testified that he made a loud noise by dropping the package outside the door, that he touched the door, and that he peered through the window, before leaving after he made eye contact with a resident inside.

Fetters argues "[n]o reasonable trial court could conclude that there were 'marked similarities'" between his conduct there and his conduct at the Califf house. Fetters contends there were solely two allegedly probative similarities between his conduct during the charged incident and the earlier delivery: (1) Fetters looked through a glass window or door into a home, and (2) nothing was taken from either home. Because the similarities were so minimal, Fetters argues, the judge could not reasonably have found evidence of a common scheme or plan "to steal property from these houses."

Fetters' representation of the evidence is incomplete and unavailing. During both deliveries, Fetters inexplicably walked around the back of the house and made noise

of these elements.

outside the house to announce himself. It is not manifestly unreasonable for a court to conclude that Fetters was checking to see whether anyone was home before entering, which is evidence probative to a burglary charge. Further, under Thang, the two occurrences took places hours apart on the same day, along the same delivery route—showing both geographical proximity and commission within a short time frame. 145 Wn.2d at 643. Moreover, Fetters' repeated assertion that nothing was taken from either home is irrelevant because the crime of burglary does not require successfully stealing property.

For these reasons, the court did not abuse its discretion in finding a "markedly similar" pattern of conduct—one that suggests, under Lough, that Fetters had a plan used repeatedly to commit separate, similar crimes. 125 Wn.2d at 856.[5]

### III.    CONCLUSION

We affirm.

Díaz, J.

WE CONCUR:

Birk, J.

Smith, C.J.

---

[5] We need not address Fetters' claim of cumulative error as we have identified no reversible error.